OPERA ON TOUR, INC., Respondent, v. JOSEPH N. WEBER, as President of American Federation of Musicians, and GEORGE E. BROWNE, as President of International Alliance of Theatrical Stage Employees & Moving Picture Machine Operators of the United States and Canada, Appellants.*

First Department, January 26, 1940.

* Revg. 170 Misc. 272.

*Henry A. Friedman*, for the appellants.

*John Kadel* of counsel [*Kadel, Sheils & Weiss*, attorneys], for the respondent.

CALLAHAN, J.   Plaintiff is engaged in the business of presenting public performances of grand opera in various cities throughout the United States.   Its productions omit the usual " live " orchestra, substituting a mechanical reproduction of an orchestral accompaniment in place thereof.   The performances are given with full stage scenery and with a company of actors on the stage, including some choral singers, but the mechanical device used also reproduces additional choral singing.

Defendant Weber is sued as president of the American Federation of Musicians, a union which includes musicians who play in theatres and at operatic productions.

Defendant Browne is sued as president of the International Alliance of Theatrical & Stage Employees and Moving Picture Machine Operators of the United States and Canada (hereinafter referred to as the I. A. T. S. E.).   Its membership includes stagehands as well as choral singers.

The gist of plaintiff's complaint is that the musicians' union has induced the I. A. T. S. E. to order its stagehand members to refuse to work for plaintiff, because plaintiff uses mechanical music; that, as a result of the refusal of the stagehands to work, plaintiff has been unable to present many performances for which it had contracted, as most of the theatres throughout the country are " closed shop " theatres, requiring the handling of stage scenery by union hands.   Plaintiff contends that it is impossible for it to continue in business successfully if it uses " live " musicians, for the reason that the expense involved would be so great that it would be unable to meet the same.   It contends that fifty or sixty musicians would be required for a proper orchestra.   There is evidence in the record, however, that a touring opera company,

somewhat similar to the plaintiff's, uses only sixteen or seventeen musicians. Plaintiff contends that so small an orchestra would be inadequate.

The records from which the plaintiff mechanically reproduces its orchestral music were made in London, England, by English musicians.

One Vladimir Schavitch, who was formerly a member of defendant musicians' union, but who was dropped for failure to pay the wages of musicians employed by him, was the one who conceived the idea of using mechanical reproductions of orchestral accompaniments. Schavitch continues to act for plaintiff as its artistic director of productions under a written contract.

The defendants contend that he (Schavitch) is working for a compensation less than the scale provided by the union. They also contend that a non-union pianist was used at rehearsals. The claims concerning Schavitch's employment and compensation and the employment of the non-union pianist do not seem to have been advanced by defendants until after the stagehands quit work and after this action was commenced.

The evidence discloses that the real reason for refusing to work was that the musicians' union, after giving consideration to the subject at various meetings, determined that the rendition of opera with mechanical or " canned " music (as it is frequently referred to in the record) would increase unemployment among its members. They thereupon determined to endeavor to prevent the use of such music. They passed resolutions opposing all productions using " canned " music, and called the attention of the I. A. T. S. E. to plaintiff's use thereof. The I. A. T. S. E. likewise considered the question of the use of " canned " music, and passed a resolution opposing the use thereof in connection with the production of opera. It subsequently ordered the stagehands to stop working for plaintiff.

Plaintiff says that this action was unlawful in that the object of the " strike " was illegal. It contends that it never hired, or intended to hire, orchestral musicians, and that the defendants' efforts, if successful, would result in compelling plaintiff to hire employees who are unnecessary to the conduct of its business.

Plaintiff, after a trial, has secured a judgment against the defendants, which, among other things, permanently restrains defendants from directing or advising any persons to leave or not to enter plaintiff's employ because of the latter's use of mechanically reproduced music, or because of plaintiff's employment of Schavitch as artistic director.

Defendants are appealing from that judgment on the ground that their action in refusing to have union men work in performances of opera in which mechanically reproduced music was used was within their rights. They assert that their conduct was lawful and necessary to protect their membership from the evil of increased unemployment. They assert further that the employment of Valdimir Schavitch and of a non-union pianist justifies their action.

Defendants raise the additional contention that this is a labor dispute within the meaning of section 876-a of the Civil Practice Act, and that the complaint should have been dismissed for failure to comply with that section. They also contend that, as section 876-a is applicable, the injunction should have been limited to a period of six months instead of being a permanent one.

It appears quite clearly from the evidence in the case that the defendants herein acted without actual malice or ill will in the matter. It seems undisputed that their actions have been guided by the primary motive of self-interest, in that they believed that unemployment would be increased if the use of mechanical music at operatic performances was not stopped. That it was not the defendants' primary or direct intent to injure or destroy plaintiff's business appears from the testimony and the documentary evidence in the record. This proof shows that the musicians' union took the position that if " live " music was used, they would have their members work for plaintiff. They refused, however, to compromise upon any basis less than the hiring of a " live " orchestra.

The record further discloses that the defendants deliberated carefully upon the effect that the use of mechanical music in the theatre and moving picture houses would have on unemployment among musicians. They also considered the effect of the use of music distributed by wire and reproduced by sound devices. The result of the defendants' deliberations with regard to these matters was that they determined to oppose the use of mechanical music in all places where orchestras might be heard. It is clear that defendants were not singling out plaintiff for attack, but attacking plaintiff along with all others who contributed to the unemployment of their members by the use of mechanical music.

There was no effort on the part of the plaintiff to dispute the good faith of defendants. Plaintiff takes the position that defendants' action is unlawful, for the reason that defendants' conduct will result in grievous injury to plaintiff, and that it cannot be justified as furthering a legitimate labor objective.

Summing up the situation presented to us, we find that the defendants, in order to secure what they believed to be their economic betterment, are endeavoring to prevent the use of a mechanical

contrivance which is in the nature of a labor-saving device. This device is used to reproduce an essential element of plaintiff's business, viz., music played to accompany plaintiff's operatic performances. The case is not one where the defendants are trying to force plaintiff to use an additional feature in connection with their business, which plaintiff has determined it could do without. Plaintiff wishes to have musical accompaniment for its opera. It says it can get along with mechanical music and save the cost of musicians' salaries. The defendants say that, unless " live " musicians are hired, they will have less chance for work and, therefore, they are endeavoring, by stopping work, to prevent plaintiff's performances until plaintiff agrees to use a " live " orchestra.

It would seem to us that such conduct on defendants' part is justified as a legitimate endeavor of labor, even though it results in some injury to plaintiff.

Unquestionably, plaintiff has the legal right, if it so desires, to produce opera with mechanical music in preference to " live " musicians, but these defendant unions would seem to have an equal right to seek, by lawful and orderly means, to prevent plaintiff from using mechanical music, because the use thereof deprives their members of employment.

The court at Special Term held that the concerted refusal to work, on the part of these two unions, was wrongful. It also held that no labor dispute existed, but merely an economic question. Merely because an economic question is involved does not decide whether there is a labor dispute. Most labor disputes involve questions of an economic nature, directly or indirectly. In the present case, the economic problem may appear more prominently because the issue raised concerns the use of a labor-saving device and the effect of such use on employment.

The defendants take the position that the economic factor of cost is no more important to the plaintiff than is the economic factor of employment to the defendants. They contend that both have interests to protect, and that the courts should not interfere in behalf of either contestant.

Undoubtedly, the matter of securing employment is of fundamental interest to the workingman. Questions concerning wages, hours and improved working conditions could never arise unless there was opportunity for employment.

The right to use the concerted efforts of labor to secure employment has long been recognized in this State. In *National Protective Association* v. *Cumming* (170 N. Y. 315, at p. 327) our Court of Appeals said: " Those principles concede the right of an association to strike in order to benefit its members; and one method

of benefiting them is to secure them employment, a method conceded to be within the right of an organization to employ. There is no pretense that the defendant associations or their walking delegates had any other motive than one which the law justifies of attempting to benefit their members by securing their employment."

In *J. H. & S. Theatres* v. *Fay* (260 N. Y. 315) a combination of workmen was formed for the purpose of obtaining employment for its members. Plaintiff in that case had leased and was operating three theatres at which one member of the defendant union had previously been employed. Plaintiff thereafter employed a member of a rival union in place of defendant's member. Defendant union then demanded that the plaintiff employ three of its members; one at each theatre. The court held that the defendant's object was legitimate, even though its demand might be unreasonable. The court stated (at pp. 317, 318):

" The defendant union is a lawful combination. It may, by lawful means, endeavor to induce the plaintiff to employ its members upon terms and conditions satisfactory to it. Its demand that the plaintiff employ one of its members at each theatre, though at the present time a single employee is performing the same work at all three theatres, may be unreasonable. It is attempting to destroy the plaintiff's business in order to induce, or, perhaps we should say, compel the plaintiff to comply with its demand and refuse to go on with the contract made with the rival union.

" ' Demands of workmen may sometimes be fair and sometimes unfair. Combinations give the workmen a power of compulsion which may work harm to their employer, the public and even to themselves. Where the workmen do not combine they may be compelled by force of economic circumstances to accept unfair terms of employment. Such conflicting considerations of economic policy are not primarily the concern of the courts.' (*Interborough Rapid Transit Co.* v. *Lavin*, 247 N. Y. 65, 74.) ' It is not within the province of the courts to restrain conduct which is within the allowable area of economic conflict.' (*Stillwell Theatre, Inc.,* v. *Kaplan*, 259 N. Y. 405, 412.) A combination of workmen formed for the purpose of obtaining employment for its members upon terms and conditions satisfactory to them may use lawful means to achieve its purpose. The courts have not been constituted arbiters of the fairness, justice or wisdom of the terms demanded."

Though the cases cited did not involve the present question as to whether employees might oppose the use of a technological improvement, on the ground that it lessened the opportunity of employment, they did recognize the right of unions as a legitimate labor activity, to endeavor to secure employment for their members by combined as well as individual effort.

That the defendant stagehands' union is aiding the musicians' campaign by sympathetic action would not make defendants' action unlawful, for the stagehands have a direct interest in the subject. The economic welfare of both unions is closely related to the theatrical profession.

The limit placed on union activity is said to be that it " cannot * * * extend beyond a point where its * * * direct interests cease." (*Bossert* v. *Dhuy*, 221 N. Y. 342, at p. 365.) " Direct interests " include those of neutrals who are within the same industry. It has been held as to those outside a shop that they may have the right of self-interest in procuring unionization of the shop; and that there is too intimate a relation between unionization and economic betterment for the law to deny. (*Exchange Bakery & Restaurant, Inc.*, v. *Rifkin*, 245 N. Y. 260.)

Under the rule enunciated in the decisions of the highest court of this State, a strike may be used in a proper case to bring pressure on those having a unity of interest to conform to the ideals of union labor. Logically, therefore, there can be no reason why those in the same industry may not voluntarily strike to aid one another in support of legitimate labor objectives. Nor does the unity of interest on the part of the stagehands depend solely on the fact that they are engaged in the same industry. They have a direct and vital interest in the maintenance of employment of their own members — the choral singers — as well as an economic interest in the continued employment of those in allied trades.

There is evidence in the present case that the action of the stagehands was due to obedience to a co-operative agreement had with the musicians' union. If the object of the agreement was legal and it was made for the mutual interests of the parties thereto, fulfillment of such a treaty would not be unlawful.

In *Bossert* v. *Dhuy* (*supra*) we find several statements of the rules of the law applicable to labor disputes which seem appropriate here. At page 359 of that case the Court of Appeals said:

" An association of individuals may determine that its members shall not work for specified employers of labor. The question ever is as to its purpose in reaching such determination. If the determination is reached in good faith for the purpose of bettering the condition of its members and not through malice or otherwise to injure an employer the fact that such action may result in incidental injury to the employer does not constitute a justification for issuing an injunction against enforcing such action.

" Workingmen cannot be compelled to work when by so doing their position as workingmen will be injured, simply because if they do not continue their work a manufacturing employer will not be

able to sell as large a quantity of material as he otherwise would and thus his good will, trade or business may be affected."

And at page 365 the opinion continued, as follows: " Voluntary orders by a labor organization for the benefit of its members and the enforcement thereof within the organization is not coercion. The members of the organization as we have already stated who are not willing to obey the orders of the organization are at liberty to withdraw therefrom. The bounds beyond which an association of employees may not as a general rule go in controlling its members in their dealings with employers are not easily determined. They cannot at least extend beyond a point where its or their direct interests cease. There is a material difference in the power of an association so far as it affects its primary or secondary interest. Where the acts of an employee or employees in their individual or associate capacity are reasonably and directly calculated to advance lawful objects, they should not be restrained by injunction."

That defendants' action may result in injury to plaintiff's business does not deprive defendants of the right to continue their endeavors was held in *Interborough Rapid Transit Co.* v. *Lavin* (247 N. Y. 65), where (at p. 80) the court said: " The defendants * * * in taking lawful action to advance the interests of the members of that union * * * are under no affirmative duty of protecting the privileges or even rights of the plaintiff."

Under the principles of law which our courts have thus enunciated, it would seem to have been settled that to prevent unemployment is a legitimate labor objective, and the right to use every lawful and orderly means by concerted as well as individual action to carry out any legitimate labor objective is the privilege of workingmen. This right should be entitled to the same protection as is the right of an employer to use machinery for the purpose of making a profit. Our courts recognize that the economic conflict has two sides, both of which are entitled to consideration and protection.

It is contended by plaintiff that the objection to the use of machinery is an attempt to arrest progress. While many may deem this true, there are those who question the fact that we " progress " where we use machinery to such an extent that we destroy the opportunity for men to live by employment and thus create vast numbers of permanently unemployed. In any event, we see no reason why it is not a legitimate object of workingmen to attempt by lawful means to limit such alleged " progress " when it results in direct injury to them. Economic pressure may eventually compel the acceptance of mechanical changes, but there seems to be no legal reason why those who may be injuriously affected thereby may not meanwhile make lawful and orderly efforts to prevent or lessen

the extent of the injury to themselves. It is well known that employers do not always use the latest technological improvements where such improvements might lessen their opportunity for profits or destroy large capital investments; and no one claims that they owe any one a legal duty to do so.

In the present case the product of the machine is but a duplica-, tion of the work of " live " musicians. There is no contention by the plaintiff that original music produced by " live " musicians of equal skill may not be obtained, and would not be as acceptable to the public. The object of the plaintiff in using mechanically reproduced music is to reduce the cost of its production. It seems no more unlawful for defendants' members to wish to work, than it is for the plaintiff's stockholders to wish to make a profit. We think that the law should not take sides one way or the other in such a conflict, so long as lawful and orderly means are employed by those concerned in it.

In view of our determination that the injunction would be unwarranted under common-law principles, we need not determine the question as to whether the act of the defendants comes within the technical definition of a labor dispute as given in section 876-a of the Civil Practice Act.

Nor need we rest our decision on the somewhat belated claim that the employment of Schavitch, as well as that of a non-union pianist, presented a labor dispute. We deem that on the main issue (whether the effort of the unions by the means used herein to compel the employment of " live " musicians is legal) we should find that defendants were engaged in a legitimate labor activity, and that the injunction herein is unwarranted.

A review of the authorities cited by respondent from other jurisdictions would serve little purpose. In fact in few, if any, of such cases was the precise question raised here directly involved. A somewhat similar economic conflict did occur in the case of *Hopkins* v. *Oxley Stave Co.* (83 Fed. 912). There the defendants were engaged in an attempt to stop the use of machinery in hooping barrels. But the defendants in that action were not merely calling on fellow workmen to stop work; they were attempting to enforce a boycott against the consumption of plaintiff's products. This action was clearly illegal under the Federal authorities which controlled the decision. The statements contained in the majority opinion concerning the limitations on the lawful objects of labor combinations were based on the rule established in England, which rule is far narrower than that followed in the State of New York.

One of the authorities cited in *Hopkins* v. *Oxley Stave Co.* (*supra*) was *Barr* v. *Essex Trades Council* (53 N. J. Eq. 101; 30 A. 881).

In the latter case a typographical union objected to the use of certain "plate material," sometimes referred to as "boiler plate," in the make-up of a newspaper. The typographers organized a movement, in the nature of a campaign to boycott the paper, in which they were joined by many other labor organizations. This concerted action was held illegal, but the vice-chancellor pointed out, in his decision, that it would have been entirely legal for the members of the defendant union to leave the employ of the paper in protest against the use of the "boiler plate," and that such action would not have been considered illegal, although it was the result of a combination. The court said, in effect, that if defendants' activity had stopped there they would have been within their legal rights.

In the present case we are passing solely on the right of defendants, who have a direct interest in the subject, to stop work in protest against the use of mechanical music. We have no other question involved.

We think that the present case may also be distinguished on its facts from that of *Haverhill Strand Theatre, Inc.*, v. *Gillen* (229 Mass. 413; 118 N. E. 671). In the latter case the owner of a motion picture theatre used an organ played by hand during the presentation of its pictures. The defendant union sought to compel the use of an orchestra of five pieces of instrumental music. The Supreme Court of Massachusetts held that defendants were guilty of an unlawful interference with plaintiff's right to the free flow of labor to which every business man is entitled. The court distinguished its prior decision in *Pickett* v. *Walsh* (192 Mass. 572; 78 N. E. 753), where it recognized the right of one union to strike because it claimed jurisdiction over a particular part of building construction work as against another union, by saying that in the former case the employer wanted the work done, whereas in the case before it the defendant attempted to force the plaintiff to do work which it did not want to have done. A like distinction might be offered here. The defendants are not seeking to force one who was using "live" music to use different musical instruments nor to compel the use of more "live" musicians. They seek the use of "live," as against "mechanical" music. But even if the Massachusetts decision may not be distinguishable on the facts, it may be said that the courts of this State have never approved of law enunciated in the Commonwealth of Massachusetts supporting the right of an employer to a free flow of labor as a property right.

The present case is in no way similar to one where a shopkeeper is the sole person required to run his business and, therefore, is not

subject to picketing to compel him to hire labor for which he has no need. (See *Thompson* v. *Boekhout*, 273 N. Y. 390.)

The judgment should be reversed, with costs, and judgment directed in favor of the defendants dismissing the complaint, with costs.

TOWNLEY and DORE, JJ., concur; MARTIN, P. J., and GLENNON, J., dissent and vote to affirm.

MARTIN, P. J. (dissenting). No labor dispute concerning wages, hours, health, safety, conditions of employment or rights of collective bargaining is involved in this action. The plaintiff's opera company is a regular company in all respects, in that it carries a complete cast of singers, costumes and scenery. It also has a ballet and chorus. However, instead of using an orchestra, it uses recorded music which is produced by a specially-built recording machine. Plaintiff never employed musicians. They are not necessary in the plaintiff's organization. It is contended that if it is compelled to employ them it cannot operate successfully. By the actions complained of, defendants are seeking to compel the plaintiff to employ musicians.

The defendants oppose the utilization of a mechanical device with the purpose of forcing the engagement of unnecessary labor. By availing itself of the invention referred to the plaintiff is able to give employment to a traveling company of more than fifty singers and artists who otherwise would be unemployed. Its productions also require a stage crew of six men, in addition to incidental local assistants. Through this enterprise many sections of the country which otherwise could not afford it would enjoy entertainment in the form of grand opera performances at reasonable prices. Defendants have taken the position that it is against their interest to permit the popularization of operatic music by mechanical reproduction. If the contention of the defendants be correct, all progress resulting from inventions must cease if it interferes with the employment of some individuals, even though it may afford employment and pleasure to thousands of other people.

The great industrial development of this country is, in large part, due to the practical application of inventions and technological improvements. The majority of labor-saving devices have created greater opportunities for labor through the opening of new fields of endeavor. In some instances, adoption of new machinery has compelled readjustments, but enlightened labor organizations have found means of meeting changing conditions without resorting to strikes to stop progress.

Our attention has been called to no case in this jurisdiction which directly involved the right of organized labor to prevent the use of machinery for the reason that it reduced the opportunities of employment of a particular group of labor. In *Hopkins* v. *Oxley Stave Co.* (83 Fed. 912 [C. C. A. 8th]) a boycott by a coopers' union was enjoined. The object of the boycott was to compel the plaintiff to abandon the use of machines for hooping barrels, which materially lessened the cost of making the same, and which the union charged caused the unemployment of at least one hundred coopers. The court said: "We think it is entirely clear, upon the authorities, that the conduct of which the defendants below were accused cannot be justified on the ground that the acts contemplated were legitimate and lawful means to prevent a possible future decline in wages, and to secure employment for a greater number of coopers. No decrease in the rate of wages had been threatened by the Oxley Stave Company, and, with one exception, the members of the combination were not in the employ of the plaintiff company. The members of the combination undertook to prescribe the manner in which the plaintiff company should manufacture barrels and casks, and to enforce obedience to its orders by a species of intimidation which is no less harmful than actual violence, and which usually ends in violence. The combination amounted, therefore, to a conspiracy to wrongfully deprive the plaintiff of its right to manage its business according to the dictates of its own judgment. Aside from the foregoing considerations, the fact cannot be overlooked that another object of the conspiracy was to deprive the public at large of the benefits to be derived from a labor-saving machine which seems to have been one of great utility. If a combination to that end is pronounced lawful, it follows, of course, that combinations may be organized for the purpose of preventing the use of harvesters, threshers, steam looms and printing presses, typesetting machines, sewing machines, and a thousand other inventions which have added immeasurably to the productive power of human labor, and the comfort and welfare of mankind. It results from these views that the injunction was properly awarded, and the order appealed from is accordingly affirmed."

In the case of *Barr* v. *Essex Trades Council* (53 N. J. Eq. 101; 30 A. 881) it does not appear that the objection of the union to the use of the "boiler plate" was attributed to its effect on the employment of the union members. We find nothing in that case to support the conduct of the defendants here. What the vice-chancellor said with reference to the right of the union members to leave the employ of the paper is simply a reiteration of the theory

of freedom of contract. He said: " Certain members of Typographical Union No. 103, who were employees in his newspaper office, abandoned his employment. This they had a perfect right to do under the law. No man can be required to work for another unless he so desires, and it is his right, outside of contractual duties, to cease an employment which is distasteful to him, and, within the limit authorized by the statute of 1883, it is lawful for a number to combine to leave the service of their employer. If the defendants had stopped here, they would have been clearly within the exercise of their legal rights. But the members of the Typographical Union No. 103 were not content to stand on this right."

The conduct of the defendants is sought to be justified on the theory that the endeavor to secure employment for their members is a legitimate activity of the unions. Not every effort of organized labor to secure employment is legal. In *Thompson* v. *Boekhout* (273 N. Y. 390) a union and its members were restrained from picketing and interfering with the business of the plaintiff, where it appeared that the plaintiff, the owner of a business, had taken over the duties of a former employee. The Court of Appeals said: " Where the owner of a small business seeks to avoid ' labor disputes ' as defined in the statute, by running his business without any employees, an attempt to induce or coerce him to hire an employee or employees, upon terms and conditions satisfactory to persons associated in such attempted inducement or coercion is not a ' labor dispute ' within the letter or spirit of the statutory definition."

In *Welinsky* v. *Hillman* (185 N. Y. Supp. 257) a union sought to compel a manufacturer to continue a manufacturing department of his business which he decided to discontinue. The court said: " The purpose of the strike and of the picketing and other interference with plaintiff's business is not to secure any advance in wages or any improvement in working conditions, but to induce the plaintiff to continue the manufacturing department of his establishment, which he has determined to abandon. Of course, the right of the employees in other departments of the business to cease work for this or any other reason cannot be questioned; but neither they, nor the other employees, nor the union to which they belong, can be permitted to take affirmative action injurious to the plaintiff's business for the purpose of compelling him to continue a department of the business which he wishes to abandon. To hold otherwise would be to sanction coercion in support of a demand which the employees had no right to make. I am not insensible of the hardship to old employees thus suddenly thrown out of work, or of the loyalty of their fellow workers who seek to

come to their rescue; but I see no justification under the law for their present attempt, or the attempt of their union to compel the plaintiff to continue their employment."

In *Paul* v. *Mencher* (169 Misc. 657; affd., 254 App. Div. 851; motion for leave to appeal to the Court of Appeals denied, 279 N. Y. 813) a union was enjoined from picketing a retail fur shop and from interfering with its patrons where it appeared that the owner had discontinued his factory deliberately to avoid a labor dispute as a result of which a number of employees were discharged. The court at Special Term said: " It is the prerogative of any business man, with or without reason, to continue or discontinue in business, to change, alter or modify the nature of his business as he sees fit without necessity of explanation or excuse to any one. When the plaintiff elected to discontinue his factory no one was privileged to complain even though it was done deliberately to avoid a labor dispute. It may be unfortunate and regrettable that because of such decision willing workers are rendered idle and unhappy. When the question of the legality of an act is alone involved, the law is indifferent to the result thereof. If plaintiff had the right to close down his factory the fact that a number of people are foreclosed of employment cannot govern or limit the exercise of that right by him."

The National Labor Relations Board recognizes the right of an employer to discharge employees because of change in type of machinery. (*Matter of Uxbridge Worsted Co.*, — N. L. R. B. ——, Case No. C – 131 – April 21, 1938.)

If an employer may not be coerced to engage employees for an owner-conducted, one-man business, where a department is discontinued, where a factory has been closed down, or where changes of machinery necessitate discharge, we know of no legal right which justifies the coercion of plaintiff to bring about reorganization of its business by the elimination of the mechanical device which makes that business possible, so as to compel the employment of instrumental musicians entirely unnecessary in plaintiff's organization and whose compulsory employment means the death of plaintiff's endeavor.

The judgment should be affirmed.

GLENNON, J. (dissenting). I dissent from the conclusion reached by the majority that the judgment entered at Special Term should be reversed and the complaint dismissed.

Plaintiff was engaged in the business of giving grand opera performances at reasonable prices in those sections of the country which could not afford to pay the same scale as could be obtained

in a few of the larger cities. In order to accomplish its purpose, plaintiff used recorded music, which is commonly referred to as "canned" music, for its orchestral and choral accompaniment, thus avoiding the hiring of musicians in connection with the rendition of the opera.

It assembled a cast of over fifty singers and artists and expended a sum in excess of $70,000 to carry out its work. It entered into contracts to give performances in small cities and towns in some of the southeastern States. Six stagehands were employed under contracts which were entered into with the Marks Production Company, apparently an agency of plaintiff. Incidentally, it may be remarked that these contracts contained a provision that they could be canceled only upon two weeks' written notice to the employer.

In addition to the six regularly employed stagehands, plaintiff in each city or town made it a practice to hire twenty-three others who were members of the local unions.

It has been found by Special Term, and it is a fact, that the stagehands' union has not, and at no time ever had, any grievance with the plaintiff. The sole objection, both while the company was in rehearsal and during the time it was giving performances, was voiced by the musicians' union as to the use of the mechanical transcriptions in connection with the performances.

A short resumé of the testimony of Joseph W. Collins, who was the shop steward of the stagehands connected with the plaintiff, will shed considerable light upon the question here involved. Collins said that he was in receipt of a salary of $100 per week in addition to all traveling expenses. The opening performance was in Richmond, Va. Then followed Blacksburg and Roanoke, two other cities in the same State.

The company traveled to Knoxville, Tenn., and then to Nashville. At that time there were no musicians working for or employed by the plaintiff, Opera on Tour, Inc. Upon his arrival in Nashville, he met a man named Kelby, a business agent of the stagehands' union, who gave him instructions " to give aid to local musicians." Collins and Kelby both spoke to a Mr. Brennan, who was the vice-president of their union. Collins was instructed by Brennan " to give a show at Nashville, pack up in the car and take it back to New York." Later in the day further instructions were received from Brennan to accompany the opera troupe to Birmingham, Ala., but not to render any service in connection with the performance until further orders.

Collins gave the following testimony in detail: " Q. And you and the five other stage hands refused to work for the company

under the orders of the I. A. T. S. E. to discontinue working, is that it? A. We had no choice in the matter. Q. You had no choice in the matter after the union issued the order, is that right, Mr. Collins? A. Orders are orders. Q. Now, were you satisfied with the salary, with the money, that the company was paying you? A. Perfectly. Q. And were you satisfied with the hours? A. The hours were perfect. Q. And were you satisfied with all the conditions under which you were working? A. The conditions were excellent. Q. Did you have any complaints or any grievance against this company at all? A. Absolutely not. Q. You wanted to work, did you not? A. I did. Q. You desired to continue to work? A. I did. Q. And you wanted to earn this $100 a week that this company was paying you? A. I did. Q. What about the local stage hands, were they called out, too? A. Why, they couldn't work. When we couldn't work, they couldn't work. Q. They couldn't work after the order came from New York, from the New York office, to stop working for the plaintiff company, is that right? A. That's right."

In addition thereto he gave testimony to the effect that all expenses and salaries were paid by the plaintiff at Birmingham before he and his fellow workers left for New York. Collins' fellow employees testified substantially as he did.

There was no strike in the sense in which the word ordinarily is used. The men were compelled to break their agreements simply because the union of which they were members would not permit them to continue in their work. The result was that the plaintiff could not carry out its contracts for future performances in other cities. The company returned to New York and plaintiff was compelled to discharge the singers, dancers and other performers.

It is not disputed that without the services of the stagehands the company could not survive. No trouble would have been encountered were it not for the unreasonable demand of the musicians' union, with which the plaintiff had no contractual relations.

The basic question, therefore, is, has plaintiff the right to carry on its business in the way it sees fit by the use of mechanical reproductions instead of employing members of the musicians' union? The proposition presented transcends in importance any question which has been before the courts in recent years. If the contentions of the defendants are to be upheld, we might just as well scrap nearly all mechanical inventions. If this plaintiff can be prevented from giving its performances with the aid of recorded music, it follows naturally that the same procedure could be resorted to in order to prevent restaurants and hotels from using music which comes over the wire for the entertainment of the public.

Not only could it be applied to all musical instrumentalities but also to a great many phases of our everyday life. The owner of a business wherein members of various trade unions were employed could be prevented from driving his car if the chauffeurs' union decided to pursue the same methods as the musicians' union did in this case. As Collins, the witness, said, " You can't stop progress," and on being asked what he meant by that he replied, " Why, mechanical devices, such as sound records, sound tracks. Sitting up all night long trying to think out and dig up ways of improving and giving the public something." Applying this thought, as expressed by this witness, to the question now before us, progress has made it possible for the general public to enjoy opera at a reasonable price which could not be had if it is to be burdened by an unwarranted expense.

I do not believe that the principle adopted in the Massachusetts cases is too narrow. It seems to me that it is in accord with sound logic and reason. In addition to the case of *Haverhill Strand Theatre, Inc.*, v. *Gillen* (229 Mass. 413; 118 N. E. 671), which is discussed by the majority, attention also should be directed to a later expression of opinion by the same court which is to be found in *Yankee Network, Inc.*, v. *Gibbs* (295 Mass. ——; 3 N. E. [2d] 228). There plaintiff engaged a man named Kendis for one year as " contractor, conductor, arranger and pianist " at a weekly stipend. Kendis, who was a member of the American Federation of Musicians in New York city and elsewhere, but not of " Local No. 9," which was located in that Commonwealth, was found guilty of a violation of the by-laws and regulations of " Local No. 9 " and fined $500 about a week after he had entered into his employment. Ten members of the local who had been engaged as musicians refused to continue their orchestral work on the day the fine was imposed upon him. Although the court found that Kendis did in fact violate the by-laws of the union, nevertheless, it upheld plaintiff's contention that the union had no right to interfere with the contract made by Yankee Network, Inc., with Kendis. Mr. Justice Qua, in writing for the court, said:

" It is true that there was no direct evidence of ' threats ' by the officers of the local to the ten musicians, but there was evidence which could have been thought to show advice from the officers which caused the musicians to abandon their employment through fear of action by the officers and the local and against their own desire. The precise word used to describe this is unimportant.

" The findings and the evidence together show that the defendants, having no trade dispute of any kind with the plaintiff, combined to prevent the carrying out of the contract between the plaintiff and Kendis and to prevent Kendis from working for the plaintiff

and that they succeeded in that purpose. Such a combination for such a purpose was *prima facie* unlawful both as an interference with the contractual right of the plaintiff and as an interference with the right of the plaintiff to manage its own business in its own way and to have free access to the market for musical talent. [Citing cases.]"

There is no need here of directing attention to the case of *Hopkins* v. *Oxley Stave Co.* (83 Fed. 912) since it is referred to in the majority opinion. Nor is it necessary to mention the opinion of the trial justice, as it appears reported in 170 Miscellaneous Reports, 272, and adequately covers my views.

I would add, however, that I do not believe that there was any labor dispute within the meaning of section 876-a of the Civil Practice Act. (*Thompson* v. *Boekhout*, 273 N. Y. 390.)

The judgment should be affirmed.

Judgment reversed, with costs, and judgment directed in favor of the defendants dismissing the complaint, with costs. Settle order on notice reversing findings inconsistent with this determination, and containing such new findings of fact proved upon the trial as are necessary to sustain the judgment hereby established.