**ALLEN BRADLEY CO. et al. v. LOCAL UN-ION NO. 3, INTERNATIONAL BROTH-ERHOOD OF ELECTRICAL WORKERS, et al.**

District Court, S. D. N. Y.

Sept. 30, 1941.

728

McLanahan, Merritt & Ingraham, of New York City, for plaintiffs.

Frank P. Walsh and Harold Stern, both of New York City, for defendants.

LEIBELL, District Judge.

Ordered, that the above entitled case be and it hereby is referred to John Kirkland Clark, as special master to hear and determine all issues of law and fact therein and report thereon to this Court with all convenient speed.

CLARK, Special Master.

The difficult problems presented by this case are whether the actions of the defendant local union and its officers constitute a violation of the provisions of the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1–7, 15 note, which forbids combinations in restraint of interstate trade, and, if so, whether the plaintiffs are entitled to injunctive relief.

The defendant union, by the exercise of its economic force, has unionized the entire industry of large scale installation of electrical equipment in New York City and has likewise unionized the factories in New York City which produce certain types of electrical equipment essential in the building construction of today. The electrical contractors who employ members of the union are united in associations. The manufacturers are members of an association. The union has brought about a joint arrangement through the cooperation, voluntary or enforced, of the contractor groups and the manufacturing group with the union, whereby certain types of electrical equipment made by the local manufacturers are the only articles of that type permitted to be installed in electrical construction work in New York City. The natural and necessary effect has been to restrict the market, raise the cost to contractors, builders, and ultimately the community, and to create a barrier which excludes from installation in New York City similar products made by the plaintiffs, which were formerly widely sold in New York City through interstate commerce, for use in building construction here.

The plaintiffs are eleven corporations engaged in the manufacture of electrical goods and appliances, Allen Bradley Company, Allis-Chalmers Manufacturing Company, Clark Controller Company, Colt's Patent Fire Arms Mfg. Co., Cutler-Hammer, Inc., the Electric Controller & Mfg. Co., General Electric Company, Monitor Controller Company, Square D Company, Trumbull Electric Manufacturing Co., and Westinghouse Electric & Manufacturing Company. They maintain plants throughout the United States and their manufactured goods are widely distributed in the course of interstate commerce. They employ tens of thousands of workers, who are represented by various unions, as bargaining agents, in many cases as a result of elections or other steps pursuant to the provisions of the National Labor Relations Act, 29 U.S.C.A. § 151 et. seq.

Each of the plaintiffs is engaged in manufacturing various types of electrical equipment and materials, such as electrical switch-boards, panel-boards, distribution-boards, power switches, safety switches, knife switches, enclosed switches, cut-out boxes, air circuit-breakers, motor starters

and controls, and other industrial control apparatus, lighting fixtures, lighting sockets, signalling devices, conduits, and wire and cable for the transmission of electrical current.

The business which the plaintiffs claim has been blocked by the activities of the union and its affiliates amounted to millions of dollars.

The defendants are Local Union No. 3 of the International Brotherhood of Electrical Workers, an organization affiliated with the American Federation of Labor, and certain of the Local's officers and agents.

The union membership, at the conclusion of the hearings, included 16,000 or 17,000 workers, journeymen engaged in electrical trades and employees of manufacturers making materials used in connection with electrical installation.

The defendant union, while a unit of an organization affiliated with the American Federation of Labor and originally consisting solely of journeymen electricians engaged in installation work, has branched out, in recent years, into broader fields, so that approximately (if not more than) half of its membership is composed of workers other than electricians, an organizational union along lines similar to those of the Congress of Industrial Organization.

The plaintiffs sue to obtain a judgment declaring that the defendants, in conjunction with electrical contractors and manufacturers of electrical goods and appliances in New York City, have committed acts violative of the Sherman Anti-Trust Act, Act of July 2, 1890, 26 Stat. 209, 15 U.S. C.A. § 1; that, under the provisions of the Clayton Act, Act of October 15, 1914, 38 Stat. 737, 15 U.S.C.A. § 26, an injunction should issue restraining the union in conjunction with the other alleged co-conspirators from barring certain products of the plaintiffs from entering into the installation of electrical equipment in New York, through interstate commerce.

The defendants deny that any action on their part constituted an interference with interstate commerce; they maintain that all of the activities in which they engaged were legitimate labor activities dictated by their self-interest and falling into the sphere designated in the latest opinion on the subject handed down by the Supreme Court as "licit and not illicit"; and that, in any event, this court is without jurisdiction by reason of the provisions of the Norris-LaGuardia Act, Act of March 23, 1932, 47 Stat. 70, 29 U.S. C.A. §§ 101–115 depriving the courts of the United States of any power to issue injunctions in cases where a labor dispute exists in such a situation as is presented in the case at bar.

The action was begun December 9, 1935. Issue was originally joined by an answer on February 6, 1936. An amended complaint was served on April 2, 1937, and issue was finally joined by an answer to the amended complaint on May 7, 1937.

Meanwhile, an action for treble damages was brought by eight of these plaintiffs (omitting Allen Bradley Company, Allis-Chalmers Manufacturing Company, and Monitor Controller Company), with whom two additional parties joined, the Okonite Company and John J. Whitman, doing business as the Reading Chandelier Works. In the treble damage suit, all of the present defendants are parties, and, in addition, there are joined as individual defendants, Harry Van Arsdale, Jr., John J. Sullivan, and William A. Hogan. The issue was joined in this case at some time prior to March 12, 1937, on which date the damage suit appeared on the Calendar of the United States District Court, and, by stipulation, it was marked off.

In the summer of 1937, the parties decided that the trial in the case at bar, instead of being conducted by a Judge of the United States District Court, should, for the convenience of the parties and counsel and the most efficient handling of the tremendous bulk of material, be referred to a Special Master to hear and determine the issues in the case. Thereafter, and on July 1, 1937, the parties entered into a stipulation reciting that they "are desirous that the above-entitled action be referred to a Special Master to hear and determine all issues of law and fact herein", and the order of reference bearing the same date, directed that the Special Master "hear and determine all issues of law and fact therein". It was then anticipated that six or eight months of hearings three days a week would suffice, and that the matter could be disposed of within a year. Instead, hearings which began in October, 1937, were not concluded until March 7, 1940. Thirty-one volumes of typewritten testimony and argument were taken in over 200 hearings, covering over 25,000 pages. More than

1,700 exhibits were submitted and over 400 witnesses called. To elucidate the issues, counsel have presented over three thousand pages of printed briefs.

When it is considered that the testimony involved sharp issues of fact covering hundreds of different incidents and scores of different jobs, the task of reaching a conclusion as to which of such issues are sufficiently material to warrant comment in a decision is, in itself, a tremendous task. Therefore, for the most part, only the general progress of developments involved in the creation of the situation which constitutes the basis for the case at bar will be taken up, with occasional illustrations as to incidents throwing light upon that development.

This being an equitable proceeding and many of the events deemed material having occurred after the beginning of the proceeding, the issues grew constantly more complicated and involved. Meanwhile, also, both before and after the conclusion of the testimony, rulings of the courts on important problems involved in the case at bar for the first time reached the final authority, the United States Supreme Court.

After the conclusion of the testimony and the submission of the original briefs, counsel argued the case orally for four days. Since the oral argument, the Supreme Court has handed down several important decisions bearing upon the issues involved, each of which counsel has felt strongly supported their side of the case, and additional briefs have been filed to clarify such claims.

The Court had the benefit of the assistance of counsel on both sides of the case, who were outstanding leaders of the bar, particularly in the complicated and involved problems arising from the relationship between capital, management and labor, interstate commerce and the "interlacing statutes" known as the Sherman Anti-Trust Act, the Clayton Act and the Norris-LaGuardia Act. Frank P. Walsh, chief counsel for the defendants, died during the course of the proceeding, but his associate proceeded to the conclusion of the case with unimpaired skill, ability and vigor, despite the heavy burden thus thrown upon him. The case was prepared with remarkable care and thoroughness on both sides. The issues of fact and the questions of law have been ably and exhaustively presented to the Court. As additional decisions of the Courts have been handed down since the conclusion of the case, further study of their

effect and forceful arguments based upon them, both written and oral, have been furnished the Court in a mutual effort to reach a sound and just conclusion to one of the most difficult problems ever presented to a Court.

The essential facts are established with reasonable certainty by a clear preponderance of the credible evidence. The membership of the defendant local union, which rose from 4,500 in 1925 to almost 7,200 in 1931, dropped, during the years succeeding the economic crisis of 1929, until it numbered less than 5,500 in 1936. In 1934, it elected as its business manager, Harry Van Arsdale, Jr. While the union has executive officers, president, recording secretary, financial secretary and treasurer, and executive council, the real management of the union's labor affairs rests almost absolutely in the power of the business manager and those whom he appoints as business agents. They constitute a contractors' committee, which determines which of the electrical contractors in the city shall be permitted to have contracts with the union. The evidence is overwhelming that no electrical contractor can do important electrical construction work in New York City without a contract with the union.

The business manager, through his contractors' committee, not only determines what contractors shall be granted contracts with the union, but he likewise, under the form of contract in force for years, has, and habitually uses, the power to determine what members of the union shall be employed by a contractor who needs an electrical worker. He designates who shall be foremen and shop stewards, at higher rates of pay.

Year after year, as contracts came up for renewal, Van Arsdale, as business manager of the union, fought for and gradually obtained a reduction of the number of hours which a union member could work during any week or any day at the specified rate of compensation. Year by year, also, the rate of compensation per hour during the specified hours per day and per week was increased. There is no evidence in the record to indicate that the increased wage per hour resulted in any increased amount of work or any improved quality in the work. It is also clear from the record that, while under the latest requirements, only six hours of work per day can be called for at the regular rate, and only five days of work a week, there is no real objection to overtime

work, as long as the hours of overtime are paid at double the ordinary rate of $2 per hour. There is no evidence in the record to indicate whether the annual earnings of the journeymen in the union have increased over the amount earned when more hours or days of work at lower rates were specified.

The defendant union is one of the constituent members of the New York Building Trades Council. This Council includes about 120 local unions engaged in building construction work, with a membership of some 200,000 workers. Van Arsdale is vice president of the organization. The understanding between the unions is that if any one of them declares the contractor on a particular construction job to be unfair, the union suffering from such unfairness may call all members of the affiliated unions engaged in the construction work to go out on strike. That this power constitutes no mere idle threat was amply demonstrated when Local No. 3 engaged in a strike on new subway work, and, through the cooperation of other trades unions, succeeded in halting the entire construction work on the new subway for over two months.

The union has entered into contracts not only with individual contractors, but with associations of contractors in the several boroughs. Practically all of the contractors handling large volumes of work are members of these contractors associations. During the past five years, every one of the contractors associations had acquired an executive secretary who was formerly a union office-holder.

In 1934, there were half a dozen local manufacturers engaged in the manufacture of electrical switch-boards and similar electrical equipment, doing business for the most part on a small scale. The falling off in construction work in the metropolitan district in the early 1930s had left them in a precarious financial condition. The rate of pay which was given to their workers was materially lower than what the union members engaged in construction work were receiving. The field seemed ripe for unionization, and a campaign was instituted by Local No. 3 to unionize the local switch-board industry. The movement was successful.

Ultimately, every one of the local switch-board manufacturers made an agreement with Local Union No. 3, and granted increases of pay to its workers. Up to that time, these local union factories had furnished to local contractors in electrical construction work here but a small proportion of the total amount of the material of the type which they made. The great bulk of the business was being done by the plaintiff companies. By the end of 1936, sales of the goods manufactured by the plaintiffs of the same classifications as those manufactured by the New York City manufacturers who had signed contracts with the union, practically ceased. The business was acquired entirely by the local manufacturers. The union maintains that this result was brought about solely because the local contractors formed a desire to use the product of the local manufacturers because of greater convenience in handling of orders and a desire to do business with concerns which employed members of the same union as their employees. The evidence establishes that such expressed motive is the merest subterfuge. In fact, the result was brought about by the combined actions of the contractors and the union.

In the case at bar, it was the practically undisputed testimony of all concerned that the union, through its business manager, with the "economic power" of 16,000 or 17,000 members and 200,000 associates in construction work, was in a position where the most powerful of the contractors or of the manufacturers was absolutely incapable of successfully contesting any issue with the union. A contractor cannot do any important electrical work in New York without employing members of Local No. 3. The continuance of his contract with the union depends upon the favorable exercise of the power of the union toward him.

The evidence is clear that the union furnished the contractors organizations with a "fair list". It constituted a "black list" of those not named on it. On that "fair list" were included, as manufacturers of switch-boards, only these companies in New York which employed the members of this particular local union. The official publication of the union instructed the members to insist upon the union label, meaning the label of Local Union No. 3, on all products where a label was available. Even though similar products bore the label of other local unions of the International Brotherhood of Electrical Workers, those products were not acceptable. In fact, when the International President of the I. B. E. W. forwarded a "fair list" on which were included the names of other manufacturers of such goods who employed members of other local unions of the "Brotherhood", Local Union

No. 3 eliminated, or "black-listed", all of the names approved by the national organization except those employing its own local union members, before furnishing the New York contractors with a "fair list" for use here.

The defendants strenuously insist that this course constitutes merely an attempt by the local union to procure more work for its members. It appears clearly, however, that what happened was that the local manufacturers were forced by the "economic power" of the local union to consent to the signing up of all of their employees by the defendant local, obviously in consideration of their obtaining the exclusive market for their products in the metropolitan area, and the barring from the metropolitan area of all similar products made by others. This resulted in the almost complete curtailment of interstate commerce in such products, entering New York City.

This was brought about by agreements and understandings entered into by the manufacturers, the contractors, and the local union. It resulted, generally, in the creation of a monopoly in New York City for the products of the local manufacturers, who were thereby enabled to raise their prices materially over the open market prices which had formerly resulted from the competition of similar products from factories in other states, which were no longer permitted to be installed in New York City.

The cooperation of the contractors was obtained through the creation of a body of which every local New York City electrical contractor employing members of Local No. 3 was required to become a member. The contract under which they operated was known as the "Voluntary Code". Under its terms, every contractor was required to file with the code committee every bid made by the contractor on any work authorized in New York City. This arrangement for filing of bids covered not merely private contracts, but public contracts as well.

In figuring bids on such work, the members were required by the rules to add 35% to the labor cost for "overhead", and 10% to the cost of material as "commission" and to "load" the bid with at least 6% for management cost. If any bidder made a low bid which figured 10% or more below the average of the bids submitted, his bid was subject to investigation to determine in what particulars he was engaged in price-cutting. Price-cutting was penalized by substantial fines.

The code committee consisted of representatives of the various contractors associations of the several boroughs and two members of the local union, business manager Van Arsdale and one of his assistants.

Originally, this "Voluntary Code" contract had been written into the new contract made by the union with the several contractors associations and other contractors, when new agreements were made in the summer and fall of 1936. The man who had formerly been the head of the contractors association, Charles L. Eidlitz, was engaged as chairman of the code committee, having general supervisory power over its operation.

At about the same time the local switchboard manufacturers organized an association and engaged as manager this same Charles L. Eidlitz, paying to him as compensation 1% on all contracts amounting to more than $500.

Thus we have the picture of the most powerful men in the union sitting on the governing board of an organization which included all of the important electrical contractors in the city, who filed details of their bids with the policing committee on which the union members sat, and the head of that code committee was the same man whose compensation as chairman of the association of switch-board manufacturers depended upon the volume of sales made by the local manufacturers.

Although originally the voluntary code was sent down to the International Office in Washington for the approval of the President before it could be adopted as a part of the new annual contract made by the union with the contractors association, the President of the I. B. E. W. refused his approval of the code arrangement on the sound ground that it was illegal and not a proper enterprise for union activities. Whether or not it actually remained a part of the contract which was signed by the union officers with the contractors was a question as to which there was a sharp conflict of evidence. The International President did not appear to clarify the matter.

In actual operation, however, it seems comparatively immaterial whether it was thereafter embodied in the contract, since it appears indisputably that every contractor of any importance who had a contract with Local No. 3 became bound by the code arrangement, in which the all-powerful business manager of the union participated.

Since all of the local contractors were required by the union rules (sedulously enforced, under penalty of possible expulsion from the union for violation thereof by the union representatives) on every job, to use only Local No. 3 products when such products were available, it was a matter of no concern to the contractor what price he paid for the product, so long as every other contractor had to pay a similar high price for the same material. In fact, the higher the price of these products, the greater the profit to the contractor, since he added, as required by the Code, 10% on the figured cost as a commission. The contractors made more money; the code administrator, as manager of the switch-board manufacturers association, made more money, and the added cost was passed on to the general contractor, to the owner of the building, and, ultimately, to the public.

One of the local manufacturers did business on a scale that warranted his entry into the general market outside of New York, with published price-lists, for the trade. That manufacturer, the evidence established, maintained two separate price lists on articles in the restricted class; one for the New York City market, ranging in some instances 100% higher than the other, priced to meet competition in the free market outside. The evidence is reasonably clear and persuasive that there was a material increase in cost of these products, which, in turn, resulted in increased costs to the citizens of New York at every building, as a result of the monopoly in the market in such manufactured goods. Yet the union insists that there is nothing involved here but an attempt on the part of the union to improve the condition of its members by obtaining higher wages and better working conditions. The union contends that the people of the United States, through Congress, have enacted legislation which legalizes such a course of procedure.

There is no doubt that if the plaintiffs were engaged in selling goods manufactured under conditions which the defendant union was undertaking to change by a campaign to enroll their workers in the "International Brotherhood", of which the defendant local is a constituent member, and carried on its campaign alone and unassisted except by other union members, as was the case in the Duplex Press case (Duplex Printing Press Co. v. District 15 of the International Ass'n of Machinists, 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349, 16 A.L.R. 196) and the Bedford Cut Stone case (Bedford Cut Stone Co. v. Journeyman Stone Cutters' Ass'n of North America, 274 U.S. 37, 47 S.Ct. 522, 71 L.Ed. 916, 54 A.L.R. 791) such a combination, consisting solely of members of the union, would be regarded as not constituting a combination or conspiracy actionable under the Sherman Anti-Trust Act, certainly not by injunction. This is made clear by the Milk Wagon Drivers' Union case, Milk Wagon Drivers' Union v. Lake Valley Farm Products, 311 U.S. 91, 61 S. Ct. 122, 85 L.Ed. 63.

It becomes essential, therefore, to make an analysis of the facts which, the plaintiffs claim, differentiates the case at bar from such a case.

In the case at bar, as already pointed out, the union undertook to conduct the boycott not solely through its own membership, but by allying itself with contractors and manufacturers. The conspiracy and combination therefore was not a mere association of fellow workers in the union.

The objective of the combination and the conspiracy was not to carry on the unionization, or any change or improvement in working conditions in the factories of the plaintiffs outside of New York State. In the case at bar, business manager Van Arsdale and his associates frankly stated that they were in no way concerned with the working conditions, the rate of wages or the union affiliations of the plaintiffs' factories. It was immaterial to them whether members of other locals of their own union were employed by the plaintiffs.

It appeared that in more than one instance, the plaintiffs had made contracts with employees in their factories, under supervision of the National Labor Relations Board, through the union which the workers in the factory voted should represent them in their negotiations with the management. In other words, several of the plaintiffs had contracts with their employees which had been entered into, under the supervision and, in some instances, under the direction of an agency of the United States Government, which conducted elections to determine what organization should represent such workers. The management had made the only contract which it was legal for it to make, and yet its goods were barred from the New York market solely because it could not employ members of the defendant Local No. 3 of the I. B. E. W.

It is entirely clear from the record in the case at bar that, with the exception of a minor controversy which was inactive at the time when this action was instituted, there had been no attempt by the defendants to engage in any negotiations with any of the plaintiffs as to terms or conditions of employment or as to representation of its employees in negotiations.

No matter what any one of the plaintiffs might have done at any one of its factories, with regard to wages, hours or other terms or conditions of employment, it could not have avoided the absolute exclusion by the local union, in conjunction with the contractors and manufacturers, barring its products of the proscribed types from the New York City market and stopping that activity of its interstate commerce.

No matter what any one of the plaintiffs could have done in recognizing any group which it was possible for it to recognize in negotiation or arranging terms or conditions of employment, it could not break down the barrier thus erected.

It seems preposterous that the people of the United States, through its Congress, intended to include such a situation as this in the protection afforded to a union in negotiating terms and conditions of employment or gaining the right to negotiate. This certainly is not what anyone, using the English language in its normal sense, could deem to be a "labor dispute". It is a clear-cut attempt at an arrangement which shall prevent any competition in New York City from products manufactured by any persons other than those who employ the New York City members of a particular local union.

As counsel for the plaintiffs has forcefully pointed out, if such a combination and conspiracy as has been established in this case is to be held legal, and the plaintiffs should be held entitled to no right to enjoin its operation, it will be but a short time before unions, contractors and manufacturers in Chicago, Detroit, Philadelphia and other great centers of manufacturing and building will enter into similar combinations and conspiracies and the free flow of interstate commerce in the products of such factories will cease.

Thus, even more effectively than the several Colonies, under the Articles of Confederation, were able to accomplish by interstate tariffs, the free flow of interstate commerce, which was one of the great objectives sought in the adoption of our Constitution, will be blocked, under the claim that, because those engaged in the conspiracy include groups of workers, formed into a labor union, the Constitution and the laws enacted under it entitle them to destroy such interstate commerce.

The law certainly should not be construed as accomplishing any such result. The courts should protect the rights of interstate commerce as sedulously as the rights of individual workers, banded into unions with thousands of members and almost unlimited power. The combination and conspiracy in the case at bar are clearly illegal and its operation should be enjoined.

### Analysis of the Evidence.

In view of the tremendous mass of evidence which has been submitted to the Court and which has been analyzed and discussed in more than a thousand pages of the briefs and memoranda submitted, and the discussion of the law, covering thousands of pages in the record, the briefs and the opinions in the hundreds of cases cited, it seems essential to outline the main factors in the evidence and the law which have led to the foregoing conclusion.

### The Plaintiffs.

The Allen Bradley Company is a Wisconsin corporation, with factories in Milwaukee, in which it employs about 830 people. It has a contract with its employees through the United Electrical and Radio Workers of America.

The Allis-Chalmers Company is a Delaware corporation, with its principal factory in West Allis, Wisconsin, where it employs about 7,500 people, and another factory in Boston, Massachusetts, employing about 375 people.

The Clark Controller Company is an Ohio corporation, with factories in Cleveland, Ohio, employing 450 people. It also operates the Sundh Electric Company, which formerly had a factory in Newark, New Jersey, but, since 1934, all of its manufacturing has been done in Cleveland.

Colt's Patent Fire Arms Mfg. Co. is a Connecticut corporation, with all of

its factories in Hartford, employing about 2,000 people.

Cutler-Hammer, Inc., is a Delaware corporation. It maintains a factory in Milwaukee, employing about 2,500 people and has had agreements with two American Federation of Labor unions. It also has a factory in New York City in the Borough of the Bronx, employing some 300 workers.

The Electric Controller & Mfg. Co. is an Ohio corporation, with a factory at Cleveland, employing over a hundred people.

The General Electric Company is a New York Corporation operating over a dozen factories, two in Lynn, Massachusetts, with 6,700 employees; at Pittsfield, Massachusetts, employing 4,500 people; at Bridgeport, Connecticut, with 3,800 employees; at Schenectady, New York, with 12,000 employees in the manufacturing division; at Bloomfield, New Jersey, with 1,300 people employed; at Philadelphia, Pennsylvania, with 2,500 employees; Erie, Pennsylvania, with 3,400 employees; at Ft. Wayne, Indiana, employing 4,500 people; Decatur, Indiana, employing about 400 people; at Ontario, California and Oakland, California (supplying only western trade); at York, Pennsylvania, with 125 employees; at New Kensington, Pennsylvania, with 150 employees; and a lamp division in Cleveland, which, with other lamp factories, employs 8,000 people. The Lynn, Massachusetts, works, pursuant to the results of the election of 1934, under the auspices of the National Labor Relations Board, has collective bargaining arrangements with United Electrical Radio & Machine Workers of America. The Bridgeport plant has a similar arrangement with another local of that C. I. O. union. Similarly, the Schenectady plant has entered into an agreement with another local of the C. I. O. union; likewise, at New Kensington. The Bloomfield, New Jersey, plant dealt with two groups, one the C. I. O. local, and the other an Employees Union. The Philadelphia plant, as a result of an election, deals with the Independent Electrical Workers Organization, and at Erie and Ft. Wayne no designation has been made as to the exclusive workers' bargaining agent. The York plant, as a result of an election, deals with an independent union.

The General Electric Company also has a plant in New York City, employing about 71 persons, at which work is done on switch-boards, and, since 1939, has been negotiating, after an election under the auspices of the National Labor Relations Board, with the defendant union.

The Monitor Controller Company is a Delaware corporation, with a factory in Baltimore.

The Square D Company is a Michigan corporation, with a factory in Detroit, employing about 400 people in manufacturing with a C. I. O. union as a negotiating body; a plant at Peru, Indiana, employing about 140 people, under an agreement with the C. I. O. union; a factory in Milwaukee, employing 250, working under agreements with two American Federation of Labor unions; a factory in California, with 150 people, working under an agreement with the local of the I. B. E. W.

The Trumbull Electric Manufacturing Co. is a Connecticut corporation, with plants in Plainville, Connecticut.

The Westinghouse Electric & Manufacturing Company is a Pennsylvania corporation, with works in East Pittsburgh, employing between 8,000 and 12,000 people, dealing with the C. I. O. union as a bargaining agency, and plants at Nuthall, Pittsburgh, with 400 employees; Attica, New York, with 200 or 300 employees; Bloomfield, New Jersey, with 1,500 employees; Mansfield, Ohio, with 1,200 to 1,500 employees; East Springfield, Massachusetts; Derry, Pennsylvania, employing about 200; Chicopee Falls, Massachusetts, with 300 employees; Lima, Ohio, with 1,000 to 1,200 employees; South Philadelphia, with about 2,000 employees; Cleveland, Ohio, with 400 or 500 employees; Sharon, Pennsylvania, with 2,500 employees; and the Bryant Electric Company plant at Bridgeport.

### The Defendants.

The defendant is a local union designated as Local No. 3 of the International Brotherhood of Electrical Workers, affiliated with the American Federation of Labor, and originally consisted of journeymen electrical workers and helpers. They now constitute what is known as "Charter A" members, most of them doing electrical installation work, but some fabricating switch-boards in factories, another group

wiring and assembling lighting fixtures, and another classification engaged in installation work on alteration jobs.

The "Charter B" members consist of various groups engaged in factory work, the portion of the union membership which really makes it a C. I. O. union, in its construction.

Half way through hearings in this case, at the end of September, 1938, it appeared that only 4,000 of the total membership of 14,600 were journeymen electricians in construction work, the remainder being maintenance men, city employees, superintendents, and men and women engaged in manufacturing electrical equipment, including the lampshade industry and electrical supply houses.

As the defendant's brief truly states, "Local No. 3 is both a craft and industrial local union" (Page 143). Before the manufacturing employees were eligible for union membership (which was originally confined to journeymen, apparently), there were, as far back as 1925, ,500 members, more than the number of journeymen in 1938. In other words, the increase of membership from 4,500 in 1925 to 14,400 in 1938 constituted, in large part, the men and women who were employed in stores and factories, and who, for the most part, have nothing to do with the installation of electrical equipment.

Local Union No. 3 is the largest and most powerful of the unions in the I. B. E. W. Its territorial limitation was originally the City of New York. For the purpose of unionizing certain plants just outside the City of New York, it persuaded the International office to allow it to take into its membership workers in certain factories in the lower part of Westchester County, although the jurisdiction, as far as electrical journeymen workers was concerned, apparently remained in the Westchester local. A similar exception was granted to Local No. 3 for certain factory workers in northern New Jersey. But, although for a time the products of a factory in New Jersey which employed members of Local No. 3 were permitted entry into the local market, the product of another factory only a few miles away, employing members of another local of the International Brotherhood were barred under the boycott.

Up to 1933, the construction workers had an eight-hour day and a five-day week, with a rate which began at $4 per day in 1903, and reached $11.20 in 1933. Since that time, for a six-hour day, and a thirty-hour week, the rate has been fixed at $2 per hour, with double pay for overtime. Since 1892 Local No. 3 has been an integral part of the International Brotherhood, and, at that time, it entered into a contract with the Electrical Contractors Association, which was the predecessor of the current organization, the New York Electrical Contractors Association. Included in the membership of the present union, which was originally composed solely of "inside workers", is the membership, which formerly constituted Local No. 20, of men engaged in "outside work".

The journeymen workers, and those classed with journeymen workers, are known as "Charter A" members, and they have the sole power of electing the executive officers of the organization. It includes electricians doing maintenance work, motor repair, manufacturing of switches, switch-boards, and control-boards of various types. This group, known as "Class E" first became eligible to the union in 1934. The other large group in "Class A", or "Charter A", membership consists of "Class I" members, who, for the most part, are limited to doing repair and maintenance work, and small installation jobs on one and two-family houses.

There are three main groups in the non-electrical divisions, those who are in factories, making boxes, signal equipment, conduits, wire, and cable, and miscellaneous other materials used in electrical installation. The other divisions in the "Charter B" group include the men and women who make electrical lamps, shades, and novelties, employees of supply houses, and those who make parts for fixtures.

During the period between the financial crash of 1929, and 1934, unemployment was so general that only about one-fourth of the members were employed. During that period, an unemployment fund was created, a part of which was paid in cash to unemployed members, but, before it was finally discontinued, the bulk of it was applied by the union to the payment to itself of the dues of the unemployed members.

### Reaction on Labor Conditions

Reaction on Labor Conditions in the Defendant Union Resulting from Improved Techniques in the Making of Electrical Equipment.

The developments in electrical equipment which have been reached in the improvement of electrical apparatus for modern uses are responsible for the controversy involved in this case. In the earlier days of electricity, at the turn of the century, there was comparatively little power equipment, and most of the electrical installation had to do with lighting installation. The apparatus was comparatively simple. The journeymen electrical workers or contractors fabricated switch-boards from slabs of wood or stone or composition, with holes drilled through, to carry the appliances and the current-carrying parts, and did practically all of the fabrication on the job.

As modern building developed, with electrically operated pumps, elevators and other apparatus, distribution of the electrical power from the street outlet to the various feed-lines called for more complicated equipment, and the business of fabricating switch-boards gradually became a factory job.

In 1906, a controversy arose as to whether the manufacturer had the right to send his workmen down to do the work of installing a switch-board "on the job". The journeymen workers, who were quick to perceive that their "jurisdiction" was being invaded, protested.

The switch-board was made in a non-union shop, owned by the man who controlled the electrical contracting company which was doing the electrical work on the Altman building. His non-union manufacturing employees undertook to install this switch-board.

A controversy arose, as a result of which the arbitration board of the Building Trades Employers Association rendered a decision that the right to assemble and install the current-carrying parts of the switch-board, under the provisions of the section of the electrical trade agreement then in force, was work which "belonged" to the New York Electrical Workers Union.

Just how broad and significant this decision was in the general conduct of the electrical installations was the subject of bitter controversy between the parties in the case at bar. The union insisted that that decision constituted a primary and fundamental ruling that the work of assembling a switch-board belonged to the journeymen "on the job" and not to the factory workers. The plaintiffs, on the other hand, maintained that the decision was one which merely construed an agreement which was then in existence and was not, in fact, and was not intended to be a general ruling covering the entire business. This point of view is sustained by the fact that, the following year, the union and the contractors entered into a new contract which limited the jurisdiction of the journeymen "on the job" to the wiring of boards delivered unassembled to the job, and permitted the delivery and erection at the job of completed boards by the manufacturers.

After a decision by the Building Trades Electrical Association in 1913, sustaining this limitation, a different clause was put in the agreements of 1917. In 1924, the Council on Industrial Relations, consisting of representatives of the manufacturers, the contractors, and the unions, adopted a "Declaration of Principles" which condemned agreements or understandings designed to obstruct the free development of trade or to secure to special groups special privileges or advantages as subversive of the public interest, and shortly thereafter, a self-contained laundry machine, on which the manufacturer had mounted the control wiring, was held to be properly delivered on the job fully wired. The decision found it to be against "good sense, economy and the terms of the agreement", that such wiring on such machines should be removed and again installed at the building.

The situation which existed in the last half of the 1920s and the early 1930s with regard to the claim of the union to the right to fabricate switch-boards on the job is clouded in uncertainty.

The union representatives insisted that the earlier decisions construing agreements which were then in force were basic and applied even when agreements did not contain such provisions. It is quite apparent that this position was not that of the contractors, and it appears from testimony introduced by the defendants that until 1933 or 1934, during which period the development of the art of factory fabrication of switch-boards and control-boards had proceeded very rapidly, these boards for the most part came to the job wired and with the current-carrying parts attached.

It is self-evident that it is uneconomical to have a practice which necessitates the unwiring and dismantling of completely

fabricated control-boards, which are now used universally in the distribution of electric power to innumerable appliances for pumping, air-conditioning, elevator service, lighting, heating, and other purposes, and then require the refabrication of such boards at the site of the building in which the board is to be erected.

The evidence does not sustain the defendants' contention that that was the situation prior to 1933 and 1934. Even the business manager and his business agents stated in their testimony that their claimed jurisdiction was widely violated, although they did present some evidence by some journeymen to the effect that switch-boards always came to the job "knocked down". In the light of the other evidence in the case, the fact must be found that there was no agreement or understanding or practice to this effect prior to 1934.

In 1932 and 1933, after the panic of 1929, the building industry in New York was confronted by a falling off of business to practically nothing. As the defendant union was almost entirely dependent upon installation in new construction work, the journeyman worker was confronted by conditions of acute distress. When Van Arsdale became business manager, he and his associates undertook to obtain for the members of the union doing construction work all additional work on which a claim could be placed. They had observed that, as the result of a boycott on prefabricated lighting fixtures which the union had effectively instituted, a number of the members of the union succeeded in obtaining employment in wiring such fixtures in shops set up for that purpose in New York City.

The evidence clearly establishes that the insistence by the union that completely wired lighting fixtures should not be installed on any building within the jurisdiction of the union but that all such fixtures should be delivered in New York City "knocked down" and the wiring put in here, materially increased the cost of such fixtures in New York City buildings and gave work to but a small group of union members, but the question of added cost was one which never concerned the union.

Van Arsdale and his associates decided that if such a monopoly could be created by refusing to install completed lighting fixtures, there was no reason why a similar boycott should not be instituted in connection with the installation of switchboards and control-boards, which were constantly becoming more complicated and involved. The unionization of the local switch-board factories and the boycott of such products made by the plaintiffs was then effected.

The occasion to make another move in this direction soon presented itself. In recognition of the desperate situation which confronted the building trades and its workers, a tremendous building operation in the center of the city was undertaken, involving the expenditure of many millions of dollars in construction work and material. Buildings of extraordinary height and floor space were designed and in process of erection in the Rockefeller Center group.

Electrical control-boards of tremendous size were required to meet all of the varied uses to which electrical power was to be put in the operation of the buildings. When these boards arrived at the building site, completely fabricated and ready to be connected up by wires from the board to the several distribution points, the amount of work on these prefabricated boards which, thirty years before, would have been done on the job by the journeymen, moved the union leaders to demand that such work should thereafter all be done at the job site; that all installing and wiring, and placing bus-bars and affixing all current-carrying parts must be done by members of the local union at the local site.

It did not concern them that all this work had to be done previously at the factory in order to test the apparatus and demonstrate that it was working properly, and that, after such test, additional unnecessary work at the factory was required to disassemble the board and ship the current-carrying parts separately. A stand was made and a strike was threatened, unless an agreement should be entered into which would, as the union phrased it, "preserve the work opportunities of the local union".

Naturally, the representatives of the manufacturers could not see any justification for such a claim, and, when a conference of contractors, union men, and representatives of the manufacturers assembled, and the manufacturers stated their position, the union representatives suggested, and the suggestion was acted upon, that the manufacturers' representatives be

excluded from the further consideration of the problem.

By that time, the union had succeeded in unionizing the switch-board factories in New York City and had begun to make operative its boycott of all switch-boards not manufactured by its own members. In order to create a situation where this arbitrary increase in the cost of equipment should be less distasteful to the contractors, the union had insisted upon the insertion in its contract with the electrical contractors of a provision that all equipment used on the job should be purchased by the contractor. Under the "Voluntary Code", the contractor was required, in bidding, to include a 10% charge on all equipment purchased, or an arbitrary profit to that extent in the form of a "commission". Under the code also, an arbitrary "overhead charge" of labor costs amounting to 35% of the pay-roll was also included. It was, therefore, profitable to the electrical contractor to have more expensive switch-boards, and it did not concern him, for all of his fellow-contractors were similarly bound, if in the erection of control-boards, added labor cost was imposed, since 35% profit on such added cost accrued to him. While the contractors opposed the practice as uneconomical and tried to reduce the sphere within which the operation of the rules should be confined, they were finally induced to accept an understanding embodied in an agreement dated March 29, 1935 (Exhibit 9).

It contained a compromise, in that it was provided that the panels for control-boards might be shipped with the instruments mounted thereon, but that if such instruments were for any reason shipped separately, the mounting should be done by the electrical contractor and all panels should be mounted on the frames by the contractor, and that all wiring and current-carrying parts, including bus-bars and copper connections, even though they came to the job already bent to fit the connection by the manufacturers, should be assembled on the job by the electrical contractors, employing members of the defendant local.

Excluded from the operation of this agreement were individual starters or control-units of not more than five horse-power and self-contained pump equipment with motors up to and including three horse-power. Jobs already estimated prior to April 8, 1935, were excluded from the operation of it.

Two striking illustrations of the effects of this agreement and its cost to the community are furnished by the job at the sewage disposal plant on Ward's Island and the lift-bridge on the Harlem section of the Triborough Bridge. The enormous, complicated, and involved wiring and current connections on those control-boards were required to be removed from the boards and reconstructed by members of the local union.

The effect of the operation of such a rule is obvious. While the union men who got a few score or a few hundred hours of unnecessary work benefited, to that extent, the contractors and the public were called upon to meet the cost of the original wiring and fabrication, the cost of the unwiring and dismantling, and the cost of the rewiring and reassembling and refabrication, in the Triborough Bridge case, with new wire and new copper connections, discarding the original current-carrying material as junk.

The ultimate effect of the operation of such performance was, of course, to increase the cost of such equipment materially, and, where similar apparatus could be manufactured in union shops here, with the fabrication done by members of the defendant union, this unnecessary cost was avoided, since the union requirements, as they were generally carried out in such cases, did not call for the refabrication of boards manufactured in factories employing members of the defendant local union, even though in a different group and obtaining a lower wage than the journeymen working on the job.

Although the agreement did not specify, it was apparently the understanding of those present that what is known as "wall type" equipment, which was normally and almost necessarily delivered "enclosed," to be inset into a wall with merely incoming and outgoing connections, was to be excepted from the operation of the agreement. In the carrying out of this unspecified understanding, a considerable number of differences of opinion arose in the course of the operation of the general agreement.

On the Ward's Island job, in which the electrical equipment contract was awarded to a union contractor for approximately $750,000, more than a hundred control-panels, a metal-clad switch-gear, and bench-boards were required to be "knocked down", dismantled, unwired and reassembled by members of the local union, the total

added cost amounting to over $17,000. Only a very small portion of this work was necessitated by any cause other than the union's demands. On scores of other similar control-board jobs, similar incidents occurred, and the clearly evident increase in the cost of construction which resulted was passed on, through the contractor and builder, to the general public, indirectly, or, in the case of public works, directly.

There is a sharp conflict in the evidence as to the factors which induced the electrical contractors thereafter to discontinue the procuring of bids and the submission of contracts for the furnishing of equipment from manufacturers outside of New York City, such as the plaintiffs in this action. The testimony of the contractors on this subject was so utterly unreliable and unconvincing that no impartial auditor could believe it. The testimony of representatives of the plaintiffs who had heretofore sold substantial quantities of equipment to the contractors was uniformly to the effect that the contractors explained their refusal to make further purchases as due to the operation of union rules. Many of these conversations were denied by the contractors' representatives whose remarks were quoted, but the denials were far from convincing, and the entire course of conduct of these purchasing agents for the contractors was so entirely consistent with the declarations which they made in declining to ask for or receive further bids from outside manufacturers that no sensible person could harbor a doubt that it was the union's regulations which so summarily cut off almost their entire business that the outside manufacturers thereafter were invited to make and made no bids on switchboard and control-board equipment such as that made by the local factories.

### The Lighting Fixture Wiring Situation.

While, in the old days when construction was simpler and less involved, it was economically practicable and justifiable to insert the wires in lighting fixtures, as well as to string wires through ducts or tubes between the lighting fixture and the switch, which controlled it, on the job, the manufacture of lighting fixtures in quantities running up into the hundreds for installation in a single building brought about a situation where the work which the journeymen constituting the defendant union had previously done "on the job" was being done much more economically in factories, thus "depriving them of their jurisdiction".

In the late 1920s the managers of the union who supervised the union men doing the wiring of fixtures, under the direction of Business Agent Jacob Solomon, determined that the union must make a stand against its members being deprived of this work which had originally been "under their control". The defendant local when this question of wiring fixtures arose, undertook to test its power, and, with the aid of threats of strikes in all building industries unless the wiring of fixtures was done by its members, it caused the cancellation or modification of contracts for the installation of pre-wired or factory-wired fixtures, even when the contracting party was the government of the United States.

There were a number of shops in New York City employing journeymen of the defendant union specially trained in fixture wiring, and the union demanded, and succeeded in enforcing its demand, that all fixtures sent in to the New York area for use on extensive building operations must be wired here by members of the local union, even though the factory-wiring had been done by members of another Local of the same "International Brotherhood". The cost of shipping fixtures unassembled and unwired and the wiring of them in New York City factories was obviously and demonstrably far higher and this increased the expense to the contractor, to the builder, and, finally, to the consuming public.

This demonstration of the power of the defendant union is involved in the pending controversy primarily as a preliminary to the creation and enforcement of similar arrangements covering the principal subject matter of this controversy, switch-boards and power control-boards. The re-wiring of electrical fixtures by members of the defendant union, journeymen, though not journeymen of the "installation" class, came firmly into the grasp of the defendant union before the economic developments at the close of the 1920s.

### Boycott of other Materials.

While the union started out as a craft union and a union of the journeymen engaged in electrical construction work, and, even now, the unlimited power of franchise is still confined to such journeymen members, the success of the union in unionizing electrical fixture wiring shops and confining the installation of electrical fixtures to its members in such shops at greatly increased prices, and its experience in unionizing

switch-board and control-board factories with a consequent increased revenue to the union, and an increased cost to the public, revealed further possibilities to the ambitious leaders of the union.

Other material entered into electrical work, in the manufacture of which no electrical skill, education or training was required. Those engaged in its manufacture were not unionized. As a first step, men engaged in the manufacture of copper wire used in electrical construction in a few comparatively small factories in New York City were organized into a branch class of the union. Every effort was made to bring about the use of only the wire of such factories, in the construction work conducted by members of the local Electrical Contractors Association. This was a difficult task since, just outside the territorial jurisdiction of Local #3 were two large wire factories employing over a thousand workmen. A special dispensation was obtained from the general officers permitting the local to extend its activities into Westchester County, and these wire factories were subjected to such pressure that their workmen enrolled as members of this special class of the New York City union.

Soon, after this effort to gain increased power and revenues for the union, the campaign was extended to cover floor lamps and their equipment including shades of one sort or another made by women workers, and a new branch class of the union was created. The boycott was extended also to knife and safety switches and resulted in an effective exclusion from the metropolitan area of such products as did not bear the label of the local union. Finally, the journeymen electrical workers engaged in electrical installation constituted but a minor fraction of the entire group, although they retained the sole right to vote on the general affairs of the union. In other words, Local #3 of the International Brotherhood of Electrical Workers affiliated with the American Federation of Labor, became an industrial rather than a craft union, with the added power which the possession of such control over an organized industry gives to the union in its increased finances and power of dictation.

## Power of Union.

The power of the union to effectuate such arrangements was strikingly demonstrated by its dealings, not only with private contractors, but with the City of New York. All of the union contractors carried on their work under contracts with the union, under which the union agreed not to strike but to negotiate or arbitrate all differences, so that an amicable agreement could be reached, without interruption of work. Almost without exception, the contractors were held to the terms of this contract by the union. The union, however, felt entirely free to violate its few obligations under these contracts whenever needed to . demonstrate its power in order to impress those for whom it was working, including the City of New York.

In 1935, the Board of Education made a series of contracts for the construction of new schools. Under the law requiring the award of such contracts to the lowest responsible bidder, a contract was awarded to a contractor who was not the possessor of a contract with the union, although, under the law, he was required to pay and was paying the prevailing rate of wages.

It was not enough to call a strike on the building where this man was at work, but, without the slightest justification, all Local #3 men then employed by union contractors on other construction work in other public schools then in process of erection were summarily called out on strike. The City, through its Board of Education, was confronted with the necessity of breaching its contract with the non-union contractor who had received the award, or else having all work then being done on public schools indefinitely suspended by both the members of Local Union #3 and by all other construction union workers as well.

The cost of upholding the law by suffering such a stoppage of work on all Board of Education construction was so frightful that the responsible officials can hardly be blamed for taking the course which would result in the resumption of building operations and forcing the non-union contractor to give up his contract.

Not only the building of public schools, but highway construction was similarly ruthlessly interrupted when one job on the new Hudson River Highway was awarded to the lowest bidder, who did not employ members of Local #3 on his particular job. Forthwith, all highway jobs of the city were struck and the electrical construction work on all highways suspended until, again, the cost of such delay seemed too great a price to pay for upholding the right

of the lowest bidder to complete his contract.

Similarly, in the construction of new subways, the award of a contract to the lowest bidder, who did not employ members of Local #3, resulted in one of the most expensive strikes of all, and, as in all of the other cases, only in this instance to a greater degree, a tremendous increase in the cost to the city resulted.

While the city had the power to award its contract on such terms and conditions as the courts of New York might find were justified by the laws, the work of building the subways was being materially financed by aid from the Federal Government. Such financial aid was dependent upon the award of the contract to the lowest responsible bidder. The refusal of the union to permit work to go on if such an award was made resulted in repeated refusals of the awarding authority to grant the contract to the lowest bidder, whereupon, not only was a materially increased cost imposed upon the city for the construction of this work, by an award of the contract to a union contractor at a higher figure, but the city forfeited the aid to which it would otherwise have been entitled from the Federal Government in the financing of the contracts.

In every case, the public paid materially higher prices for the work, totalling in all hundreds of thousands of dollars, moneys which could be raised only by increased contributions from the public in the form of taxes, but, again, the "jurisdiction" of Local #3 was sustained.

This series of events is material as illustrative of the power exercised by this local union not only over the electrical contractors but in all construction work, including that conducted by the community, through its duly chosen officials. The union contractors' claims to the work were upheld, the union "jurisdiction" was protected, and material increase of costs to the public resulted.

It is not surprising, after the defendant union had shown its power and the group of union contractors were awarded contracts at much greater cost, that these contractors, not satisfied by this protection against competition which they derived from the operation of the voluntary code, worked out a further protection from competition by agreeing among themselves to "rig" bids for city work. The conviction of ten of the most prominent electrical contractors for submitting false bids in this process resulted in a fine and suspension of sentence.

The developments during these years establishing the power of this local union over electrical contractors, electrical manufacturers, and the general contracting industry, brought about its most striking attempt to "protect" the local electrical manufacturers in connection with the work of another great public enterprise, the World's Fair. A number of the plaintiff corporations had expressed a willingness, not only to participate in exhibiting their products at the World's Fair, but to contribute their financial support by the purchase of bonds of the organization to the extent of millions of dollars.

They found themselves in the uncomfortable position of having to construct buildings to house their exhibits by the employment of contractors who declined to use the prohibited equipment of these manufacturers in the construction of their own buildings. The absurdity of this situation was so grotesque that the manufacturers protested to the President of the World's Fair Corporation, Mr. Grover Whalen, and there ensued a remarkable series of negotiations between the manufacturers, the representatives of the union and the World's Fair authorities.

The electrical contractors who had, by official action, just expressed to President Tracy of the International Brotherhood their wholehearted support of the efforts of the union to confine the installation of electrical products to union-made goods, and which had put into operation a complete ban on certain of the manufactures of the plaintiffs, which had, at that time, been in force for many months, blithely informed Mr. Whalen that there were no manufactured electrical products which were not "freely" bought and readily used by them and by the union men whom they employed. Mr. Van Arsdale, representing the union, joined in these hearty denials of any limitations of purchases. When plaintiff manufacturers asked a specific agreement and undertaking on the part of the contractors and the union that they would install the goods which the contractors had been refusing to purchase and the union had been declining to install, an agreement was made whereby the plaintiff manufacturers were assured that there would be no discrimination against their products, either in the construction of their own build-

ings, or in construction, generally, at the World's Fair.

It took only a short time to prove that this representation was merely lip-service and that the previously existent boycott of the specific products of the plaintiffs was continuing on World's Fair work as well as in the general contracting work of the electrical contractors. Finally, President Swope of the General Electric Company, threatened the withdrawal of the financial support of his company and the other companies against whose products discrimination was being shown, unless an absolutely free market was maintained. Thereafter, products of the plaintiffs of the types theretofore boycotted were permitted to be used in the buildings of certain of the plaintiffs.

The union, however, was not willing to allow the World's Fair, or the exhibitors to handle the construction work directly, even by employing members of Local #3, but, to protect their cooperating associates, the electrical contractors, they insisted that all electrical work must be done not only by Local #3 members, but under contracts made with electrical contractors holding contracts with Local #3, thus protecting the electrical contractors in their profit on all purchases of equipment made. A slight but amazing indication of how far this profit-taking went is shown by the insistence of the electrical contractors that even when the electrical manufacturers contributed equipment to be used on these contracts, the contractors should collect a 10% commission on the cost of the donated equipment. Thus is established quite persuasively one of the inducements which led the electrical contractors wholeheartedly to support the project of using union-made goods.

The control of the union over the contractors and their organizations was further illustrated by the fact that every one of the larger electrical contractors associations, in Manhattan, Brooklyn, the Bronx and Queens, were furnished by the union with well-trained agents to act as executive secretaries of the contractors' associations. While these executive secretaries had to give up active participation in union affairs while "on leave" in the service of the contractors, they remained in possession of withdrawal cards, which entitled them to resume union membership on the termination of their employment. Naturally, they were in a position to, and did, see to it that there was no unfairness in the dealings of the contractors with the union and its members.

### Conclusion as to the extent of the Boycott.

It is therefore this Court's finding that the local union conspiring together with the local union contractors and the local union manufacturers, have instituted and made effective boycotts upon the plaintiffs' products which have totally excluded these products from moving in interstate commerce into New York City, or have imposed such restrictions as to rewiring and reassembling as to constitute an undue burden upon such commerce.

In the case of panel boards and switchboards the boycott has become absolutely complete and commerce in these articles has been effectively stifled so far as manufacturers outside of New York City are concerned, with the exception of such products as the local manufacturers are not equipped to make. As to this latter type, traffic in these articles has been so burdened as to constitute an undue burden upon such commerce.

In the case of lighting fixtures, commerce in these articles has been unduly burdened by requirements that such articles be either disassembled and rewired and reassembled in New York shops, or else that such articles be shipped in a knocked-down condition so that they may be wired and assembled in New York shops.

In the case of control apparatus the situation is similar. Such types of apparatus as are manufactured in New York City are used in the Metropolitan area to the exclusion of like products of the plaintiffs. Where the equipment is not manufactured locally its installation in New York is burdened with the requirements of rewiring and reassembling in accordance with the agreement of March 28, 1935.

There has likewise been proven a complete boycott of such types of signalling apparatus, wire and cable, switches, boxes, range cords, luminous transformers, and such other equipment as are manufactured in adequate quantities by the factories operating in New York City.

From this consideration of the evidence and facts established in the case, I now pass to an examination of the law and the legal principles which govern the rights and remedies of the parties to this litigation.

## The Law.

As already pointed out, three basic statutes deal with, or affect, restraints upon interstate commerce, the Sherman Anti-Trust Act, the Clayton Act and the Norris-LaGuardia Act. In determining whether a combination or conspiracy in restraint of interstate commerce is involved in the case at bar, only the brief provisions of Section 1 of the Sherman Anti-Trust Act, as construed by innumerable decisions can be invoked. Section 1 of the Sherman Anti-Trust Act reads as follows:

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal: * * *." 15 U.S.C.A. § 1.

While it was contended, from the time when this law was first enacted, that this statute was not intended to, and did not apply to labor unions, Mr. Justice Stone, in the Apex case, demonstrates that that contention has been conclusively disposed of. See Apex Hosiery Co. v. Leader, 310 U.S. 469, at page 489, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044.

The decisions of the Supreme Court establish that when a labor union took action which constituted a combination or conspiracy materially interfering with the flow of interstate commerce, it was subject to the liabilities created by the Act. Loewe v. Lawlor, 1908, 208 U.S. 274, 28 S.Ct. 301, 52 L.Ed. 488, 13 Ann.Cas. 815; Lawlor v. Loewe, 1915, 235 U.S. 522, 35 S.Ct. 170, 59 L.Ed. 341.

When the Clayton Act was enacted in 1914, Section 16 thereof, 38 Stat. 737, 15 U.S.C.A. § 26, thereof, gave to any person injured, or threatened with injury by a violation of the Sherman Anti-Trust Act, the right to obtain injunctive relief. Under this provision, labor unions which entered upon or threatened to enter upon conspiracies in restraint of interstate commerce were subjected to judgments granting injunctive relief. Duplex Co. v. Deering, 1921, 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349, 16 A.L.R. 196; Bedford Cut Stone Co. v. Stone Cutters' Ass'n, 1927, 274 U.S. 37, 47 S.Ct. 522, 71 L.Ed. 916, 54 L.Ed. 791.

While the decision in the first Coronado case resulted in some doubt as to just what interference with interstate commerce constituted an actionable "restraint" under the Sherman Act (see United Mine Workers v. Coronado Co., 259 U.S. 344, 42 S.Ct. 570, 66 L.Ed. 975, 27 A.L.R. 762, decided in 1922), the Court by the unanimous decision in the second Coronado case (Coronado Co. v. United Mine Workers, 1925, 268 U.S. 295, 45 S.Ct. 551, 69 L.Ed. 963) held that, where the action of a union was intended to produce a result which materially interfered with interstate commerce, i. e., where there was an intent to control the supply of the goods involved entering into and moving in interstate commerce, or the price of such goods in interstate commerce, interference based on such intent constituted a restraint within the Sherman Act.

Apparently this construction by the Supreme Court still persists today, as explained and perhaps to some extent modified in Apex Hosiery Co. v. Leader, supra, since Mr. Justice Stone in his opinion in that case, speaking for a majority of the Supreme Court, based his conclusions upon the application of the principles of the second Coronado case to the set of facts found to exist in the Apex case.

It therefore seems clear that where a union participates in a combination, or conspiracy, which is intended to and does cut off from the flow of interstate commerce, articles of manufacture such as are involved in the case at bar, by a practical exclusion of them from the metropolitan area, with the intended result of limiting the use of products such as are here involved, to those manufactured in New York City by employers hiring only members of that union, where the intended result is a marked increase in the cost of the products to those who wish to purchase them for use in New York City, a combination, or conspiracy, actionable under the Sherman Anti-Trust Act has been established, entitling those injured to injunctive relief under the Clayton Act.

The evidence clearly indicates that this combination and conspiracy was intended to give the local manufacturers power to control the market price of such goods as a result of the monopoly, and to enable them thereby to meet the demands of the union as to the wages and hours of its employees and still make a profit thereon.

While the defendants have throughout steadfastly maintained that there was no violation of the Sherman Act, they have insisted that even though a conspiracy or combination, violative of that Act, were established, the plaintiffs are not entitled to

injunctive relief under the provisions of the Clayton Act since the Norris-LaGuardia Act of March 23, 1932, 47 Stat. 70, 29 U.S.C.A. §§ 101–115, deprives the United States District Court of the right, which it formerly possessed, to grant such relief because, they maintain, the acts charged against the defendants in the case at bar involve a "labor dispute".

Section 1 of the Act provides that: "no court of the United States * * * shall have jurisdiction to issue any * * * injunction in a case involving or growing out of a labor dispute, except in a strict conformity with the provisions of this Act [chapter] * * *."

The Act defines a labor dispute, Section 13(c), as follows: "The term 'labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee."

The plaintiffs maintain that there is no labor dispute, since there is no controversy concerning terms or conditions of employment or association or representation of persons in negotiation or seeking to arrange terms or conditions of employment.

The union, through its counsel urges that however much of a monopolistic effect may result from the action of the union, in conjunction with the contractors and the manufacturers, in limiting the market in New York City to goods in the proscribed class manufactured by the members of the local union, this court is without jurisdiction either to grant an injunction or to issue a declaratory judgment, since the Norris-LaGuardia Act has deprived the court of such power.

The defendants urge that under the terms of Subdivisions (a) and (b) of Section 13 of the Norris-LaGuardia Act, the case involves a labor dispute because it concerns "persons who are engaged in the same industry" as used in those subdivisions of the Act.

They read as follows:

"When used in this act [chapter], and for the purposes of this act [chapter]—

"(a) A case shall be held to involve or to grow out of a labor dispute when the case involves persons who are engaged in the same industry, trade, craft, or occupation; or have direct or indirect interests therein; or who are employees of the same employer; or who are members of the same or an affiliated organization of employers or employees; whether such dispute is (1) between one or more employers or associations of employers and one or more employees or associations of employees; (2) between one or more employers or associations of employers and one or more employers or associations of employers; or (3) between one or more employees or associations of employees and one or more employees or associations of employees; or when the case involves any conflicting or competing interests in a 'labor dispute' (as hereinafter defined) of 'persons participating or interested' therein (as hereinafter defined).

"(b) A person or association shall be held to be a person participating or interested in a labor dispute if relief is sought against him or it, and if he or it is engaged in the same industry, trade, craft, or occupation in which such dispute occurs, or has a direct or indirect interest therein, or is a member, officer, or agent of any association composed in whole or in part of employers or employees engaged in such industry, trade, craft, or occupation."

The origins of the Act afford a clue to the meaning of these sections. The Clayton Act of 1914, in Section 20, 29 U.S.C.A. § 52, thereof provides:

"No restraining order or injunction shall be granted by any court of the United States * * * in any case between an employer and employees, or between employers and employees, or between employees, or between persons employed and persons seeking employment, involving, or growing out of, a dispute concerning terms or conditions of employment, * * *" unless certain conditions are fulfilled.

In the Duplex Press case and in the Bedford Cut Stone case, in both of which so called "secondary boycotts" were involved, the Supreme Court held that the provisions of the Clayton Act prohibiting injunctive relief applied only to cases where a direct employer-employee relationship was involved and did not apply to cases where employees took action against the customers of their employers to enforce their claims against the employer. Thus the quoted provision of

the Clayton Act was confined to very narrow channels and the "Magna Carta of Labor" was completely ineffective to prevent the issuance of injunctions whenever the dispute ranged away from a direct conflict with the employer.

It was in order to obviate the effects of these decisions (as is readily seen from the Committee Reports on the Act while it was a bill in Congress, see also the discussion in the Milk Wagon Drivers' Union v. Lake Valley Farm Products case) that the Norris-LaGuardia Act was passed and particular care was used to make the language so broad that under no conceivable construction could the decisions of Duplex and Bedford cases be followed.

The language used is certainly broad, but none of the language of Subdivisions (a) and (b) of Section 13 contains any hint as to what may be a "labor dispute". The language deals expressively with the question as to "who" can be engaged in a labor dispute, and on that subject, it is most comprehensive.

It surely was not the interest of Congress to designate as a "labor dispute" any and all differences of opinion between such persons as are mentioned in Section 13 Subdivisions (a) and (b).

Many conceivable situations can be imagined having no reference to terms and conditions of employment or the representation of employees, which though between the kinds of persons mentioned in Subdivisions (a) and (b) of Section 13 have no conceivable reference to a labor dispute, e. g., a divorce action between two co-employees, or an action between two employers whereby one seeks to enjoin the other from damming upstream a flow of water to the other's factory.

It is evident, therefore, that the dispute must concern in some way the classes of cases included in Subdivision (c) of Section 13 as "labor disputes" which indeed seem to be so comprehensive as to include nearly every conceivable situation which would bring into conflict capital and labor, as such conflicts are ordinarily and reasonably understood.

There is therefore no foundation for the defendants' argument that an injunction is barred in this case solely because the parties to the suit are engaged in the same industry or otherwise fit the language of Subdivisions (a) and (b) of Section 13.

In every one of the cases which the Supreme Court has decided, construing the Norris-LaGuardia Act to bar the granting of injunctive relief, the facts have shown that there is involved a dispute as to "terms and conditions of employment" or as to the representation of employees under the terms of Subdivision (c) of Section 13:

New Negro Alliance v. Grocery Co., 303 U.S. 552, 58 S.Ct. 703, 82 L.Ed. 1012, concerned "terms and conditions of employment" inasmuch as the defendant was trying to force the hiring of negroes in plaintiff's business.

Lauf v. E. G. Shinner & Co., 303 U.S. 323, 58 S.Ct. 578, 82 L.Ed. 872, and Milk Wagon Drivers' Union v. Lake Valley Farm Products, 311 U.S. 91, 61 S.Ct. 122, 123, 85 L.Ed. 63, concerned the "association or representation of persons * * * seeking to arrange terms or conditions of employment" inasmuch as the defendant unions were trying to force plaintiffs' employees to join their union.

The evidence in the case at bar clearly shows that the defendant union was in no way concerned in improving the working conditions, or with the hours and wages, or with the proper representation of the workers in the factories of the plaintiffs. As already pointed out, they frankly stated that nothing that the plaintiffs could have done would have affected their attitude toward the limitation upon, or the exclusion of, the plaintiffs' goods in the construction industry in New York City.

Under such circumstances it seems incredible that the people of the United States should have intended, by the language used by its representatives in Congress in the Norris-LaGuardia Act, that a local union, in a particular industry, in combination with contractors and manufacturers, should effectively bar the use of all products of certain kinds from the construction industry in a City like New York, creating a monopoly on the part of the manufacturers and contractors with whom they had combined, and not be subject to the injunctive relief that clearly could be granted against its co-conspirators.

There can be no doubt that if the Municipal legislative body of New York City enacted an ordinance which had the effect of this boycott, the operation of such an ordinance could be prevented by parties prejudiced thereby. In a situation

in which the public health and safety is not concerned, and there is no claim that it is concerned in the handling of such products as are involved in the case at bar, even the legislature of the State of New York could not enact a statute imposing such restrictions.

At the time of the bringing of this action, there had been no decision of the United States Supreme Court which dealt with the provisions of the Norris-LaGuardia Act, as it affected the Sherman Anti-Trust Act, and the rights granted by the Clayton Act. Since then there have been several.

The first was Milk Wagon Drivers' Union v. Lake Valley Farm Products, 311 U.S. 91, 61 S.Ct. 122, 85 L.Ed. 63, decided on November 18, 1940, after the conclusion of the trial herein and the submission of original and reply briefs. In that case, the unanimous opinion of the Court by Black, J., held that, where a controversy arose between the defendant union and so-called independent "vendors", who drove milk wagons and peddled milk and cream obtained from the corporation which was the plaintiff in the action, and where retail stores which sold milk bought from the "vendors" were picketed by members of the defendant Milk Wagon Drivers Union, the plaintiff wholesaler and the "vendors" union were not entitled to the injunctive relief which the Circuit Court of Appeals had granted, 7 Cir., 108 F.2d 436, because the facts, in the judgment of the Supreme Court, clearly established that a "labor dispute" existed as the cause of the controversy.

In that case, the facts tended to establish that the plaintiff company had so cooperated financially, and otherwise, with the so-called "vendors" that they constituted in effect employees of the company, and a plaintiff union which took into its membership many of the "vendors" was engaged in a jurisdictional dispute with the defendant union, in which case, clearly, a labor dispute was involved, since it was concerned with the right of representation of employees, one of the specific subjects included in the definition of a "labor dispute" in Section 13(c) of the Norris-LaGuardia Act.

Mr. Justice Black, in discussing the effect of the Norris-LaGuardia Act and its applicability in cases where injunctions were sought in Sherman Anti-Trust Act cases, quoted from the Congressional Committee Reports and reviewed the "bitter political, social and economic controversy" which had arisen from the "hostility to 'government by injunction'". The opinion further, by clear implication, overruled the Duplex Company and Bedford Cut Stone cases, in so far as the granting of injunctive relief was concerned.

In the Milk Wagon Drivers' Union case, as in the Bedford Cut Stone case and the Duplex Company case, there was no claim of a conspiracy between the members of the union, against whom the proceeding was brought, and any other body. In each case, there was a clear claim on the part of the union that it was undertaking to affect the terms and conditions of employment of the employees of the plaintiff.

Until the decision in United States v. Hutcheson, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788, decided on February 3, 1941, it had been widely supposed that the effect given to the Norris-LaGuardia Act, as construed by the Supreme Court in the Milk Wagon Drivers' Union case, was limited to the withdrawal or modification of the right of injunction which had been granted by the Clayton Act.

The prevailing opinion in the Hutcheson case, delivered by Mr. Justice Frankfurter, and concurred in by three of his colleagues, substantially holds that the Norris-LaGuardia Act, with its reinterpretation of the intent of the Clayton Act, has abolished any criminal liability on the part of a union for violation of the Sherman Anti-Trust Act provisions, so long as the alleged conspiracy, or combination consists solely of the members of the union.

The concurring opinion of Mr. Justice Stone in the Hutcheson case declines to give this construction to the Norris-LaGuardia Act and decides the case without reliance thereon. The Chief Justice concurred with the dissenting opinion of Mr. Justice Roberts, holding that there was a clear violation of the Sherman Act, justifying a criminal prosecution, and that the criminal law provisions of the Sherman Anti-Trust Act had not been affected by the Norris-LaGuardia Act. The eighth Justice of the Court, Mr. Justice Murphy, did not participate in the decision.

Just what is the effect of the decision of the Court in the Apex case, as affecting such conspiracies as were found to

be actionable in the Danbury Hatters case (Loewe v. Lawlor, supra), and the second Coronado case, supra, law school professors and law review editors have written hundreds of pages during the past year to explain. Until the Supreme Court, as at present constituted, has handed down an authoritative decision on this point, the Courts below must exercise their best judgment in construing the law in the light of the court's decisions as illuminated by their opinions.

As affecting the case at bar, the most significant comments in both the Apex case and the Hutcheson case were the definite exclusion from the sphere of those decisions of such cases as were regarded as being a combination by a union with outsiders, as was the case in United States v. Brims, 272 U.S. 549, 47 S.Ct. 169, 71 L.Ed. 403. In that case a carpenters' union, in cooperation with employer carpentry contractors and manufacturers of trim and sash, engaged in a combination and conspiracy containing essential features closely similar to those involved in the case at bar. In that case, to eliminate outside non-union competition, the union, contractors and manufacturers agreed that the latter employ only union carpenters with the understanding that the union would refuse to install non-union-made millwork.

Both Mr. Justice Stone, in the Apex case, and Mr. Justice Frankfurter, in the prevailing opinion in the Hutcheson case, limited, apparently specifically, the operation of those decisions to cases in which the only combination, or conspiracy, consists of the membership of the union and clearly imply that when the union combines with other parties it forfeits the immunity which it would otherwise possess.

Mr. Justice Frankfurter, in delivering the prevailing opinion of the court in the Hutcheson case [312 U.S. 219, 61 S.Ct. 466, 85 L.Ed. 788], concurred in by three of his colleagues, specifically limits the decision in that case to situations "So long as a union acts in its self-interest and does not combine with non-labor groups" (citing the Brims case). (See also the majority opinion of Mr. Justice Stone in the Apex case, 310 U.S. 469, at page 501, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044.)

In the case at bar, in which the local union accomplishes its results through the cooperative efforts of electrical contractors and manufacturers of electrical goods, it can not well claim that it has not combined with non-labor groups.

Inasmuch as the Supreme Court, in the prevailing opinion in United States v. Hutcheson, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788, has based the reasoning whereby it reaches the conclusion that the Norris-La-Guardia Act, abolishing the right to an injunction, was intended to, and did, revoke the criminal provisions of the Sherman Anti-Trust Act upon the public policy expressed in the act, it seems worth while to consider that "public policy" in order to determine whether "these three interlacing statutes" (312 U.S. 232, 61 S.Ct. 466) have granted a labor union the right to unite with manufacturers and contractors in creating a monopoly, just because it will promote the "self-interest" of the union. Apparently, the Court in that opinion intended specifically to except such a case as the case at bar.

Certainly, the language of the declaration of public policy would support that conclusion. However strange may seem today the recitals contained in the "Whereas" clause, the conclusion seems in no way to support the contention of the defendants. Section 2 of the Norris-LaGuardia Act of March 23, 1932, 47 Stat. 70, 29 U.S.C.A. § 102 reads as follows:

"Whereas under prevailing economic conditions, developed with the aid of governmental authority for owners of property to organize in the corporate and other forms of ownership association, the individual unorganized worker is commonly helpless to exercise actual liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment, wherefore, though he should be free to decline to associate with his fellows, it is necessary that he have full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection."

Since 1932, Congress has enacted the National Labor Relations Act, Act of July 5, 1935, 49 Stat. 449, 29 U.S.C.A. §§ 151–166, and the Fair Labor Standards Act of 1938,

52 Stat. 1060, 29 U.S.C.A. §§ 201–219, commonly known as the "Wages and Hours Law". Cf. also, the Public Contracts Act, 49 Stat. 2036, 41 U.S.C.A. §§ 35–45. The administrative bodies created to carry out the terms of these Acts have held almost uniformly, and have been supported by the courts in so holding, that they give rights only to the representatives of the workers and that an employer cannot invoke their protection. Broad and drastic orders enforcing rights of workers against employers have been issued under these acts while the employer has been granted no correlative relief.

Although there have been times when our courts have been regarded as sitting in an ivory tower, oblivious of social, economic and political movements of the day, the Supreme Court, in the Apex, Lake Valley and Hutcheson cases, has written into its opinions the impressions made upon the judicial mind of such trends as the fight against government by injunction, the attempts made to exempt unions from the operation of the Sherman Act and the historical development of the public movements which resulted in the enactment of the Norris-LaGuardia Act, the latest of these three "interlacing statutes".

Yet, although reference is made to the National Labor Relations Act in the prevailing opinion in the Hutcheson case (312 U.S. 219, 234, note 1, 61 S.Ct. 463, 85 L.Ed. 788), the marked change in the relative positions of employer and organized employees seems to have passed unnoticed, and the "public policy" recital in the Norris-LaGuardia Act, quoted in full, above, in its recitals in the "Whereas" clause, sounds strange to the ears of those who see labor organizations, backed by powerful administrative agencies, under statutes passed since, forcing even the greatest employer organizations to their knees.

In the case at bar, the defendant local union, with a membership of some 15,000 working men and women, associated with affiliated unions numbering, in gross, some 200,000 employees, towers over the employer groups, the Electrical Contractors Associations and the local Switchboard Manufacturers to such an extent that it possesses almost the power of life and death over any member of the employing groups.

It would therefore seem that in carrying out the "public policy" declared by the Norris-LaGuardia Act, a reasonable interpretation should be applied to such a term as "labor dispute".

Such a limited interpretation of the words has been given by the highest court of this State, in two cases decided within the last six months, dealing with the New York Statute, almost identical in terms with the Norris-LaGuardia Act, Laws 1935, c. 477, constituting Section 876-a of the Civil Practice Act. Under paragraph 10 of that law a labor dispute is described, in terms substantially similar to those of the Federal Statute.

In construing that statute, Mr. Justice Callahan, in delivering the majority opinion in the Appellate Division, in Opera on Tour, Inc. v. Weber, 258 App.Div. 516, 17 N.Y.S.2d 144, gave a broad interpretation which so accorded with the contentions of the defendants in the case at bar that ten pages of the defendants' brief were devoted to a quotation from it. Since this case is thus marked as having so material a bearing upon the controversy at bar, the reversal of that decision of the Appellate Division by the Court of Appeals in April of this year seems to afford strong support to the contention of the plaintiffs that no labor dispute is involved in the case at bar.

In Opera on Tour, Inc. v. Weber, April 1941, 285 N.Y. 348, 34 N.E.2d 349, the Court of Appeals, by majority of four to two vote, held that where the Musicians Union called a strike of the Stagehands' Union, because the plaintiff was conducting operas by the use of phonographic records instead of instrumental music, the evidence clearly indicated that the Stagehands' Union was entirely satisfied with its wage scale and working conditions and its representation in dealings with its employers. It was also evident that, unless the phonographic music was used, the entire enterprise was financially impracticable and the stagehands, as well as other workers, would lose their employment. The Court of Appeals held that no labor dispute was involved.

In American Guild of Musical Artists v. Petrillo, July 29, 1941, 286 N.Y. 226, 36 N.E.2d 123, the same Court decided by a five to two majority that the attempt of the American Musicians Union to boycott the musical artists who joined the American Musical Artists Guild did not constitute a labor dispute.

The argument may be made that the case at bar does not come within the rule of

United States v. Brims, 272 U.S. 549, 47 S.Ct. 169, 71 L.Ed. 403, because, in the case at bar, the union was the actuating party instead of the manufacturers or employers, but in the present status of this industry in this city, certainly the "public policy" of the Norris-LaGuardia Act would seem not to justify the creation and enforcement of such a monopoly, hostile to the public interest, by exempting the union from injunction, while leaving the other parties subject to restraint.

The defendants in their reply brief (page 40) seem to agree with plaintiffs that the contractors and manufacturers are subject to injunction, assuming that the facts establish the monopoly found to exist in the present case, since they decline to argue the "case of the manufacturers or contractors". They "merely assert" that the Norris-La-Guardia Act, while apparently permitting injunctive relief against manufacturers and contractors, bars the court which might enjoin them from issuing similar relief as against the union and its members. If it is to be conceived that this is the law, some court other than this must take the responsibility of so declaring.

■ The Norris-LaGuardia Act was specifically intended to protect the normal activities of working-men, in forming a union and acting together to further their interests as members of the union, from being regarded, solely for that reason, as constituting a conspiracy, even though their union activities might to some extent, affect interstate commerce.

When such a union, reaching such power as this union has, can persuade contractors and manufacturers to join with it in a plan as a direct result of which certain products previously freely entering into interstate commerce for use in New York City are barred therefrom because the contractors will order no such goods except from the local group, it comes with ill grace for it to claim the right to proceed without restraint from the courts while, concededly, its co-conspirators are subject to such restraint.

■■ In the light of these considerations, and in the light of the declaration of the public policy in Section 2 of the Norris-LaGuardia Act, it must be concluded that the controversy involved in the case at bar is not what can fairly be called a "labor dispute" within the terms of the Norris-LaGuardia Act.

Since, therefore, the acts of the defendants, in concert with contractors and manufacturers, constitute a violation of the Sherman Anti-Trust Act in imposing illegal restraint upon trade, and since the right to injunctive relief against such practices engaged in by a union in conjunction with outside organizations, which was granted by the Clayton Act, has not been repealed by the Norris-LaGuardia Act, the plaintiffs in the case at bar are entitled to injunctive relief which shall effectively destroy the boycott which the defendant union, in conjunction with the others mentioned, has imposed upon the specified products of the plaintiffs, preventing their use in building construction in the City of New York.

The determination that injunctive relief is available to the plaintiffs in this case does away with the necessity of deciding whether, if such injunctive relief were found not available, the plaintiffs would be entitled to a declaratory judgment. On this point the Court would have done what it is going to do in this case, make findings of fact and conclusions of law on which the plaintiffs may move the Court for declaratory judgment. As to just what the effect of such a declaratory judgment would be in any other proceeding this Court has no power to determine.

Since, however, injunctive relief is to be ordered, the judgment upon which such relief is to be based will necessarily contain recitals constituting a judgment declaring the rights of the parties as sought by the first prayer for relief in the amended complaint.

While both parties, in response to a suggestion from the Court, have, for the aid of the Court, presented tentative proposed findings of fact, such proposed findings were understood, at the time of their submission, not to affect in any way the right of the parties, after the filing of the opinion of the Court, to submit proposed findings of fact and conclusions of law on which the judgment of the Court will be entered.

Such proposed findings of fact and proposed conclusions of law may be submitted within twenty days from the date of the filing of this opinion.